10 So.2d 872

## BADGETT v. DEPARTMENT OF INDUSTRIAL RELATIONS.

### 7 Div. 672.

Court of Appeals of Alabama.
April 7, 1942.

Rehearing Denied April 21, 1942.

Ling & Bains and Edw. A. Ling, all of Bessemer, and Isadore Katz and David Jaffe, both of New York City, for appellant.

Knox, Liles, Jones & Blackmon, of Anniston, and Frank R. Broadway and J. Eugene Foster, both of Montgomery, for appellee.

BRICKEN, Presiding Judge.

For the reasons stated in the respective opinions by the writer, and by Associate Judge Simpson, the judgment of the lower court from which this appeal was taken is affirmed.

Associate Judge Rice dissents and expresses his views in his opinion attached hereto.

For convenience reference will be had to the two labor organizations involved in this case, as the C. I. O. and the A. F. of L.

As appears of record Utica Knitting Mills, is a textile industry, the only textile industry of its kind in Calhoun County, Alabama. It employs some 400 employees..

On September 24, 1938, the National Labor Relations Board certified the C. I. O. as the collective bargaining agency for

all employees at said mill, and it continued as such bargaining agency until the controversy hereinafter referred to. On December 31, 1940, the C. I. O. and Utica Knitting Mills entered into a "closed shop" agreement, which required all employees of the Mill to be members of the C. I. O. and pay their dues regularly, when the same were due.

The appellant, Mrs. Lillie Mae Badgett, a member of the C. I. O. voted for the closed shop contract when it was presented to the C. I. O.

Shortly after the closed shop contract was entered into the A. F. of L. protested against the closed shop agreement, claiming that it was unfair to the A. F. of L. To give emphasis to its protest, it called a strike because of that contract and established a picket line around the Mill and by force, or display of force, kept appellant, and other employees from entering the Mill. This resulted in appellant and others being unable to work for a period of time. The members of the C. I. O. who were prevented from performing work for said period, filed claims for unemployment insurance benefits. The claims were denied. It was agreed that appellant was entitled to recover, unless she was disqualified under Section 214, subd. A, Title 26, Alabama Code 1940, which reads as follows:

"A. For any week in which his total or partial unemployment is directly due to a labor dispute still in active progress in the establishment in which he is or was last employed; for the purposes of this section only, the term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee. This definition shall not relate to a dispute between an individual worker and his employer."

This is a test case of all other claims filed. The appeal in this case, is from the judgment of the trial court that heard the matter de novo, in which the ruling was that appellant could not recover because her unemployment for the period stated was directly due to a labor dispute.

Appellant insists that this case is ruled by the Drummond case, Department of Industrial Relations v. Drummond, Ala. App., 1 So.2d 395, 398,[1] certiorari denied 241 Ala. 142, 1 So.2d 402, wherein this court said: "The Legislature never intended that one, who has purchased his protection against involuntary unemployment, should be denied those benefits because of a 'labor dispute' in which he was in no way involved and the causes of which unemployment he, his agents or organization were powerless to avert."

Appellee insists that the case is within the rule laid down in the Pesnell case, Department of Industrial Relations v. Pesnell, 29 Ala.App. 528, 199 So. 720; in which we held in substance, that if the individual or the organization to which he belonged was responsible for the enforced idleness, the individual was not entitled to benefits under the Alabama Unemployment Compensation Law, and that the Alabama Unemployment Compensation Act was amended after the facts in the Drummond case, supra, arose, in express language, excludes the appellant from unemployment benefits.

As stated, it is conceded that appellant is not entitled to recover if her unemployment was directly due to a labor dispute. By reference to the Statute quoted, we find a "labor dispute" includes "any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee." The appellant insists, "there can be no escape from the proposition, therefore, that disqualification under the labor dispute provision obtains only when the dispute is brought about by the claimant or his union. If the claimant or his union are in no disagreement with the employer, and engaged in no concerted action to leave work, then insurance is payable no matter what may have been the cause of the unemployment."

We think able counsel for the appellant overlooked the fact that the Drummond case arose prior to the 1939 amendment of the Alabama Unemployment Compensation Act. Prior to September 21, 1939, our

---

[1] Ante, p. 78.

Unemployment Compensation Act did not give a definition of a labor dispute; however, on September 21, 1939, the Legislature enacted a Statute defining a labor dispute. This Statute was carried forward into the Code of 1940. It is plausibly argued or suggested that the Statute was enacted to overturn the rule announced in the Drummond case. We do not find that the Legislature so intended. What we do find is that plain, unambiguous language of the Statute, which needs no interpretation and furnishes no field for the operation of rules of construction, says that an individual shall be disqualified for benefits, if the unemployment was directly due to a labor dispute, and in defining a labor dispute, in most comprehensive terms, the Legislature did not exclude a dispute of the kind in question. It is not believed that this court has any authority to do so.

The record in this case discloses that the appellant and her Union voted for the closed shop agreement with the management of Utica Knitting Mills. The appellant's Union passed out cards in the Mill, following the execution of the closed shop contract, to all workers who were nonmembers of appellant's Union, informing them that each would have to pay dues of $1.00 per month to the C. I. O., whether they wanted to or not. The purpose or intention of the closed shop contract was to exclude all persons from employment at the Mill who failed or refused to pay the $1.00 a month dues to the C. I. O. It is clear that the C. I. O. and the management were under the impression that they had a right to enter into a contract of that kind, and that the C. I. O. was insisting on its enforcement to the letter. It was endeavoring to rid the Mill of every employee who would not contribute $1.00 per month to its treasury, and to bar every one from employment at the Mill until the monthly dues were paid.

It is likewise convincingly clear that the appellant voted for this arrangement, and that her bargaining agent was insisting upon full compliance with the contract on the part of the management, with her knowledge and approval.

In such circumstances, it is difficult for us to reach the conclusion that appellant was unemployed *through no fault of her own.*

We lay aside, for the present, the contention that she, and her Union were attempting to annihilate the A. F. of L. Union at the Utica Knitting Mills. She and her Union were attempting to do more than that. *They were attempting to monopolize the textile labor market in Calhoun County, Alabama.*

As was said by Vice-Chancellor Backes, in LeHigh Structural Steel Co. v. Atlantic Smelting & Refining Works, 92 N. J. Eq. 131, 111 A. 376–378; "The principle of the closed shop, i.e., the monopolization of the labor market, has found no judicial sponsor. In whatever form organized labor has asserted it, whether to the injury of employer, or to labor, or to labor unions outside of the fold, the judiciary of the country has responded, uniformly, that it is inimical to the freedom of individual pursuit guaranteed by the fundamental law of the land, and contravenes public policy." Upholsterers' C. & L. M. I. Union, Local No. 76, New Jersey Section, et al. v. Essex Reed & Fibre Co. et al., 174 A. 207, 12 N.J.Misc. 637.

In Polk et al. v. Cleveland R. Co., 20 Ohio App. 317, 151 N.E. 808, 810, decided by the Court of Appeals of Ohio, it appears that Local Union No. 268 of the Amalagamated Association of Street & Electric Railway Employees of America entered into a closed shop contract with the street car company, which was the only operator of city street railway lines in the City of Cleveland. When the validity of that contract was considered, the court said:

"The first question confronting us is as to the legality of the contract involved herein. If it is a contract void against public policy, no court should allow itself to be made the instrument to enforce its obligations or to consummate an end that the policy of our law forbids.

"Contracts that are illegal and against public policy have always been discouraged by the courts, and no action based upon such a contract is maintainable either in law or in equity, either directly or indirectly, to uphold the contract. The authorities quite uniformly agree that the court should look upon such a contract as no contract at all, and that an effort to enforce it, either directly or indirectly, or to claim benefits thereunder in a court of law or equity, is an effort to procure the assistance of the court to carry out something that is against the interest of the public. And this the court will not do, even though the parties have acted under such an agreement and reaped the benefits thereof, or have been lax and tardy in invoking the claim of illegality.

"The company, one of the parties to the contract here involved, was the only operator of city street railway lines in the entire city of Cleveland, and the contract contained agreements to the effect that the company would employ only union labor. It required all employees that were not members of the union to join the union within 60 days, or otherwise be discharged.

"Contracts by which an employer agrees to employ only union labor are contrary to public policy *when they take in an entire industry of any considerable proportions in a community so that they operate generally in that community to prevent or seriously deter craftsmen from working at their craft or workmen from obtaining employment under favorable conditions without joining a union.* And such was the contract here, and it must necessarily be held to be in conflict with the public policy of our law, and illegal and void. The universal trend of authorities supports this position. In addition to the cases cited by counsel, there is to be found in 13 Corpus Juris, p. 492, § 439, a collection of the cases and a discussion of the rule." (Italics ours.)

It is suggested that the National Labor Relations Act, 49 Stat. 449, c. 372, 29 U.S. C. A. § 151 et seq., has changed the public policy of the Federal government with respect to monopolies by labor unions in industries engaged in interstate commerce. That suggestion was disposed of in Canter Sample F. House, Inc., v. Retail Furniture Employees Local No. 109 et al. 122 N. J. Eq. 575, 196 A. 210, decided by the court of Chancery of New Jersey in December 1937, where Vice-Chancellor Berry demonstrated that the decision of the Supreme Court of the United States in National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 628, 81 L.Ed. 893, 108 A.L.R. 1352, was to the contrary. It was there pointed out that Section 9 (a) of the National Labor Relations Act, *29 U.S.C.A. § 159(a) was designed to enjoin the employer against entering into any contract except with a chosen representative, and to prevent collective bargaining with any one purporting to represent the employees, other than the representatives they had selected, but that section does not preclude such individual contracts as the employer might elect to make with individual employees.*

The theory of the National Labor Relations Act is that free opportunity for negotiation with accredited representatives of employees is likely to promote industrial peace and may bring about the adjustments and agreements which the Act in itself does not attempt to compel.

In the Jones & Laughlin case, supra, the Chief Justice of the United States Supreme Court was careful to say that: "The act does not compel agreements between employers and employees. It does not compel any agreement whatever. It does not prevent the employer 'from refusing to make a collective contract and hiring individuals on whatever terms' the employer 'may by unilateral action determine.' "

Reference is made to this statement by the highest court in the land for the purpose of demonstrating that Congress did not undertake to destroy the inalienable right of an American citizen to earn his living by the sweat of his brow, without let or hinderance from any source, organized or unorganized.

"Public policy favors free competition, and the courts have been keen to recognize the right of organized labor to compete for work and wage and economic and social betterment, and to use its weapon, the strike, to realize its lawful aspirations, but none has gone to the length of sanctioning a strike for a closed shop, *which has for its object the exclusion from work of workmen who are not members of the organization.*" Canter Sample F. House v. Retail Furniture E. L. No. 109, 196 A. at page 213.

The object and purpose of the contract between the C. I. O. and Utica Knitting Mills was exactly what has been repeatedly condemned by the courts of the land.

Counsel for the appellee correctly state: "None of the facts are in dispute."

This record clearly and convincingly shows that the appellant and her Union influenced, if they did not coerce, Utica Knitting Mills to enter into an illegal and void agreement. The record likewise convincingly discloses that the appellant and her Union were attempting to assert rights that they assumed they acquired under that illegal contract, but which in fact they did not acquire and which they could not acquire as long as the State and National constitutional safeguards for the protection of individual liberty remain intact. Instead of appellant being unemployed through no fault of her own, she was unemployed because she and her Union engaged in an

unlawful undertaking. They were attempting to monopolize the textile labor market in Calhoun County and exclude every laborer from the Utica Knitting Mills who would not pay tribute to the C. I. O.

It should not be said that the appellant might embark upon an enterprise of that kind, and when opposition was encountered, remain idle until the opposition subsided, and then claim unemployment benefits. There is an ancient maxim of the law to the effect, that no man shall be allowed, in a court of law, to profit by or take advantage of his own wrong. That maxim is suggestive, whether it applies to this case or not.

The views of the foregoing authorities are fortified by the legislative declaration of the public policy of this State by Section 22, Title 9, Code 1940, which provides: "Every contract by which any one is restrained from exercising a lawful profession, trade, or business of any kind, otherwise than is provided by the next two sections, is to that extent, void."

In Shelton v. Shelton, 238 Ala. 489, 192 So. 55, it was held, that our statutes mean what they say, and that they strike down all contracts defined in the above quoted section, save the two exceptions incorporated in Sections 23 and 24 of the same title.

The case was correctly decided by the learned trial judge in the court below.

RICE, Judge (dissenting).

"For two or three years prior to February, 1941, there had been a keen rivalry between two local unions at the Utica Knitting Mills concerning which union should represent the employees in their collective bargaining with their employer, Utica Knitting Mills. Each local union claimed jurisdiction in the mill, the membership in the two unions being relatively close at all times.

"The two local unions are Local 204, an affiliate of the Congress of Industrial Organization, and Local 21500, an affiliate of the American Federation of Labor. We shall hereafter refer to Local 204 as the C. I. O., and the Local 21500 as the A. F. of L.

"In August, 1938, an election was held at the Utica Knitting Mills for the purpose of determining which union had the majority of employees and should represent the employees at said mill in their collective bargaining with the management. The C. I. O. won said election by a majority of fifty votes. And on September 24, 1938, the National Labor Relations Board certified the C. I. O. as the collective bargaining agency for all the employees at said mill. Another election was held in the summer of 1940, and the C. I. O. again won by a majority of 35 to 40 votes. There was no certification by the National Labor Relations Board after this last election.

"On December 31, 1940, the management of Utica Knitting Mills entered into an agreement with the C. I. O. which provided that all employees of the mill must become members of the C. I. O. In said agreement, the management 'Recognizes the obligations of the employees as members of the union (C. I. O.) to pay their dues regularly when same shall be due.' The claimant, Mrs. Lillie Mae Badgett, voted for the closed shop agreement when it was presented to the C. I. O.

"After the C. I. O. entered into its closed shop agreement with the Utica Knitting Mills, the C. I. O. passed out cards to the non-C. I. O. employees of the mill, which cards are as follows: 'Fellow, Workers! The T. W. U. A. has entered into a contract with the Utica Knitting Co., and wishes to notify all workers who are not members of Local 204 that there will be no payment of the initiation fee. Your dues will be $1.00 per month beginning the month of February.' The notices of the closed shop agreement were posted about Friday before the strike and picketing started on the following Monday, February 3, 1941, and the aforementioned cards were passed out by the C. I. O. about the same time the notices of the closed shop agreement were posted.

"The A. F. of L. protested against the closed shop agreement, claiming that it had a majority of the employees at said mill and that said closed shop agreement was unfair to the members of the A. F. of L. The A. F. of L. asked for another election, which was denied.

"The A. F. of L. called a strike on Monday, February 3, 1941, which lasted until March 3, 1941, because the management and the C. I. O. had entered into said closed shop agreement, which the A. F. of L. claimed was unfair to it. The A. F. of L. employees of the mill and other persons threw a picket line around the mill and forcibly kept the C. I. O. employees from entering said mill. The unemployment of claim-

ant and other members of the C. I. O. was due to the strike and picketing on the part of the A. F. of L. The management wanted the claimant and other members of the C. I. O. to work and the only thing that prevented them from working was the fact that the A. F. of L. formed a mass picket line and would not let them into the mill.

"The trial court found 'that there was a controversy resulting in a strike and violence between the A. F. of L. members on the one hand and the C. I. O. supported by the management of the mill on the other.'"

All that goes hereinabove is copied, literally from the able brief filed here on behalf of appellee. It states the facts involved, essentially. But we believe we can simplify the question before us by making a short supplementary, explanatory, but not contradictory, statement of our own. It follows:

This is a suit by appellant for benefits allegedly due under the Alabama Unemployment Compensation Act, General Acts 1935, p. 950 et seq., as amended by act approved Sept. 21st, 1939, Gen.Acts Ala. 1939 p. 721, 736.

The case was tried below upon an agreed statement of facts, wherein it was agreed that claimant (appellant) was entitled to unemployment benefits as provided in Section 213, Title 26, Code 1940 (a part of the Codification of Acts 1939, p. 721) unless she was disqualified from receiving such benefits under subsection A. of Section 214 Title 26 Code 1940 (a part of the Codification of this same act of 1939).

This subsection A. of Section 214 Title 26 Code 1940 provides that an individual shall be disqualified for benefits "for any week in which his total or partial unemployment is directly due to a labor dispute still in active progress in the establishment in which he is or was last employed; for the purposes of this section only, the term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether disputants stand in the proximate relation of employer and employee. This definition shall not relate to a dispute between an individual worker and his employer."

We are not sure that we understand, precisely, what is meant by each clause of the "Disqualification for benefits" as contained in this Subsection A. of Section 214 Title 26 Code 1940, we have quoted above; nor exactly the difference sought to be provided between *this* "disqualification for benefits" and the one existant when we decided the case of Department of Industrial Relations v. Drummond, 1 So.2d 395, 397 [2] viz: "(d) During Trade Disputes. An employee shall not be eligible for benefits for any week in which his total or partial unemployment is directly due to a labor dispute still in active progress in the establishment in which he is or was last employed."

But the decisive question, as we see it, is unchanged.

Judge Simpson, writing for this court, in the above case of Department of Industrial Relations v. Drummond, has said, it seems to us, all that needs be said about the way and manner in which the Statute under which the suit is brought should be construed. We refer to his remarks.

He there made it clear that the Legislature "never intended that one, who has purchased his protection against involuntary unemployment, should be denied those benefits because of a 'labor dispute' in which he was in no way involved and the causes of which unemployment he, his agents or organization were powerless to avert." Also that "the clear meaning of the language [that is, the language providing "disqualification for benefits" as it existed at the time Judge Simpson was writing,—and, so far as we can see, at the present time] is to confine disqualification to those who are creating the dispute or participating therein, in order to enforce their demands."

All that Judge Simpson wrote in the above connection was approved by our Supreme Court. See Department of Industrial Relations v. William M. Drummond, 241 Ala. 142, 1 So.2d 402. And it is the law by which our consideration of this case is governed.

Here, the simple facts are that a dispute arose between the C. I. O. and the A. F. of L. as to which one was entitled to be the agent to bargain—for all the employees—with the Utica Knitting Mills—a concern engaged in Interstate Commerce.

The National Labor Relations Board, as was its province, investigated the contro-

---

[2] Ante, p. 78.

versy,—taking, as seems to have been optional with it, a secret ballot of the employees—and certified to the parties the C. I. O. as the bargaining agent. All this in accordance with the law. U. S. Statutes at Large, Vol. 49, p. 449, 29 U.S.C.A. § 151 et seq.

The C. I. O., still in accordance with the law, proceeded to bargain with the employer; and entered into a contract providing that all employees should be or become members of the C. I. O.,—a "Closed shop" agreement, as it is called.

Then, the members of the A. F. of L., struck—though that is not here important.

What they did that *is* important was to surround the plant of the employer—appellant's employer,—perhaps with others, their sympathizers—and by force and arms prevent appellant from going to her work.

Of appellant, certainly, it cannot be said that she was engaged in a "labor dispute still in active progress in the establishment in which she (is or) was last employed." In fact there *was* no "labor dispute still in active progress." It had been settled.

And we know of no logical course of reasoning by which it may be said that a simple *defiance of the law* may be dignified by calling it a "dispute."

The "dispute" that *had* existed in the employer's plant had been—in all respects in conformity with the law appertaining—dissolved. All that was being done—that was "in progress," so to speak—at the time appellant suffered her unemployment, was, —insofar as *she* was concerned,—in strict, *indisputable* agreement with the law.

The utterly lawless acts of those who *forcibly* prevented appellant from entering her place of employment cannot, as we have said, be dignified by the name of "labor dispute."

But if it should be called a "labor dispute" it is certainly one with which appellant was in no way connected. And, under the authority of our holding in the Department of Industrial Relations v. Drummond case hereinabove cited, she could not, thereby, be denied her compensation to which she is agreed to be, otherwise, entitled.

The opinion and judgment of the court below are not in accord with what we have written.

The said judgment is reversed. And the cause is remanded so that the compensation to which appellant is entitled may be properly calculated—when the court from which this appeal comes will enter judgment in favor of appellant.

All that goes hereinabove was prepared by me as and for the opinion and decision of the court.

But, as appears, my associates, while refusing to agree with each other, do not agree with me.

So what I have written will, I trust, make clear my reasons for dissenting from the judgment now rendered by this court.

If one, as appellant, acting in all respects in accordance with the law, can be said in any legal sense to have *caused* her own unemployment, merely for the reason that others, *incensed* by her action, *violated* the law, preventing her from going to work by *force and arms,* I did not know it before now.

So I dissent.

SIMPSON, Judge (concurring only in the conclusion of BRICKEN, Presiding Judge, in affirmance of the judgment).

The statement in the two opinions of my associates appears to fairly and substantially present the material facts. It is my view that the Pesnell case (Department of Industrial Relations v. Pesnell, 29 Ala. App. 528, 199 So. 720) is decisive of the question under consideration, and that the principle announced in the Drummond case, ante, p. 78, 1 So.2d 395, 398, is inapplicable.

In Drummond it was declared: "The Legislature never intended that one, who has purchased his protection against involuntary unemployment, should be denied those benefits because of a 'labor dispute' in which he was in no way involved and the causes of which unemployment he, his agents or organization were powerless to avert."

But, when the unemployment of a member of a labor union is directly caused by a dispute between that member's union and a rival organization, still in active progress in the same establishment, it cannot be said that the principle of the Drummond case applies.

The law of the Pesnell case seems to be more in point, where the substance of the holding was that if an individual's unemployment resulted from a labor dispute, brought on by or participated in by an organization of which such individual was a member, then unemployment benefits

could not be collected under the Alabama Unemployment Compensation Act.

Undoubtedly, the claimant here comes within the purview of this holding. There was definitely a labor dispute; for the term "labor dispute" (as now defined in the Act, and which definition became effective after the two cases supra) includes *"any controversy* concerning terms, tenure or *conditions* of employment, or concerning the *association* or *representation* of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, *regardless of whether the disputants stand in the proximate relation of employer and employee."* (Italics supplied.) Code 1940, Title 26, Section 214, subd. A. There was certainly a controversy concerning the "terms" and "conditions of employment" and regarding who should be the representative of the employees (the bargaining agent), the C. I. O. or the A. F. of L. Unquestionably, this dispute was "still in active progress in the establishment," for the A. F. of L. was contending that the election whereby the C. I. O. gained control was illegal, was demanding another election, was objecting to the closed shop contract between the management and the C. I. O., had been so objecting from its inauguration, and, seeing that its demands and objections were being ignored, called the strike in protest and opposition to this situation. And this strike was the culmination of the controversy, the dispute. This strike was the final stage of this "labor dispute." This strike—this last phase of the labor dispute—was what caused the claimant's unemployment. Clearly, under the law, now, she is not entitled to benefits by reason of the disqualification clause in the definition, above.

This definition in the disqualification clause of the statute is specific in its declaration that *"any* controversy concerning * * * conditions of employment," which directly causes unemployment, is included in the term "labor dispute". It cannot be gainsaid that the controversy,—the strike here—which prevented the claimant from working, was concerning conditions of employment.

The disqualification clause also includes in its definition of a labor dispute those jurisdictional controversies as to who or which union should be the bargaining agent of the employees. This by the clear language of the clause, that a labor dispute

shall include any controversy "concerning the association or representation of persons in negotiating, fixing, maintaining, [etc.], terms or conditions of employment." And such term includes in its definition not only such disputes between the employees and the management, but also controversies between rival unions in the same establishment. This by the concluding phrase, "regardless of whether the disputants stand in the proximate relation of employer and employee." I think it clear that the unemployment of claimant resulted from this very thing, i. e. a controversy between the C. I. O. (of which she was a member—and under the Pesnell and Drummond cases, she would be rendered disqualified for benefits if her union were a party to or concerned in the controversy) and the A. F. of L. as to who should be the bargaining agent. And the C. I. O. having gained control by the N. L. R. B. election and by this control having procured a closed shop status for the mill employees, the loser in the controversy, the A. F. of L., utilized its final weapon of defense and protest, the strike. The result, the unemployment of claimant.

It is interesting to note that the definition of a labor dispute employed in the Alabama Unemployment Compensation Act was taken, verbatim, from the Norris-La-Guardia Act, 29 U.S.C.A. § 113(c), and National Labor Relations Act, 29 U.S.C.A. § 152(9). See Pesnell case, supra.

It also affords interesting observation—as was commented upon in the Drummond case—that the all embracive and broad definition of a labor dispute in the Federal Act was there employed for the purpose of benefiting the worker and to preserve and encourage the right of collective bargaining.

So, we have the unusual situation in the Alabama Act of a broad and comprehensive definition of a term used in a remedial statute (the Federal Acts), the design of which was to benefit the worker, wrenched from its original, legislative setting and transposed to another remedial act (the Alabama Unemployment Compensation Act) as a penalty and for the evident purpose of disqualifying the worker under the certain conditions named in the definition in the Alabama Act.

But, be that as it may, such is the present status of the Alabama statute. And however sympathetic might be our disposition to aid the claimant and whatever may

be our personal view as to the propriety of incorporating in the Alabama Act the all inclusive definition, given the term "labor dispute" in the Federal Acts, it is not here appropriate to consider. The language of the law is plain. The facts are uncontroverted. It is but the duty and jurisdiction of the court to rule in accordance with the law, as written. We cannot extend it or give it a beneficent effect which is not there.

The mere fact that, during the pendency of this controversy and while the strike was in progress, there was lawlessness, "defiance of law"—or by whatever term the acts which prevented free ingress and egress of claimant and others to and from the mill may be characterized—did not militate against the conclusion that the strike—the labor dispute—was the primary and direct cause of the claimant's inability to work at the mill. It would be specious to argue that, when a controversy resulting in a strike is attended with violence or lawlessness, it ceases to be a strike, and that the controversy or dispute, eo instante, loses its identity as such. It is nonetheless a dispute, a strike, even though acts of violence, etc., attend it.

In plain language, the facts here present the typical jurisdictional controversy between rival unions where, after a progressive controversy, one has gained control and the other strikes in protest thereof, and as a result thereof the claimant, a member of one of these unions (who by her vote for the closed shop, with other members, contributed to the cause of the strike), was rendered unemployed. The Alabama compensation law, as presently written, forbids to such a person the collection of benefits.

I think the judgment of the trial court should be affirmed for the foregoing reasons and for these reasons, alone.

I am not in accord with the views of our Presiding Judge BRICKEN that the facts of the case disclose that the mill and the C. I. O. had entered into an illegal and void contract seeking "to monopolize the textile labor market in Calhoun County." One of the late statements of the rule is found in Corpus Juris Secundum: "Closed shop contracts by employers to employ only union labor or contracts not to employ any union labor are valid where they do not operate generally in the community to prevent craftsmen from obtaining employment, but are invalid as against public policy if they do so operate." 17 C.J.S., Contracts, p. 650, § 267.

It was there further observed that "it has been said that closed shop contracts by unions which welcome to their ranks all good men in the same line of work, who will submit to the common discipline, which are governed on democratic principles and membership in which is open, on reasonable and equal terms, to all persons of good character and of skill in the trade, are valid and not against public policy." 17 C.J.S., Contracts, p. 651, § 267. From the facts presented, this seems to be the situation of the closed shop contract, entered into here, and which precipitated the strike and caused the unemployment of claimant.

Moreover, it seems unnecessary to embark upon an excursion to determine the character or quality of the closed shop contract. Whether monopolistic or fair, or whether legal or void, is of no consequence in the present discussion. The progress of the dispute in connection with that contract, finally resulting in the strike, was the labor dispute which produced the unemployment of the claimant, disentitling her to benefits under the Act.

I think the judgment should be affirmed.