36 So.2d 535

**TENNESSEE, COAL, IRON & R. CO. v. MARTIN et al.**

6 Div. 514.

Court of Appeals of Alabama.
March 16, 1948.

Rehearing Denied April 20, 1948.

D. K. McKamy, Jas. A. Simpson, Benners, Burr, Stokely & McKamy and Lange, Simpson, Robinson & Somerville, all of Birmingham, for appellant.

504

Crampton Harris, Wm. E. Mitch and Harris & Brown, all of Birmingham, for appellee.

**HARWOOD, Judge.**

This case was originally assigned to Presiding Judge Bricken. In the opinion prepared by Judge Bricken the facts have already been sufficiently set forth obviating the necessity of further recital thereof in this opinion.

The majority of the court being unable to concur in certain conclusions reached by Judge Bricken therefore express their conclusions below.

In the opinion on the rehearing in the Drummond case (Department of Industrial Relations v. Drummond), 30 Ala. App. 78, 1 So.2d 395, 401, this court stated that the essential purpose of the Alabama Unemployment Compensation Act, Code 1940, Tit. 26, § 180 et seq., was "to minimize the harmful effect on society of unemployment; that it is, in character, a form of insurance for the unemployed worker, is remedial in nature, and should be liberally construed in his favor."

This indisputable premise, in our opinion, furnishes the clearest marker for our guidance on the tangled trail of judicial decisions and opaque statutory declarations in this developing field of jurisprudence.

In his opinion Judge Bricken states that "The parties also seem to be in accord that the strike above referred to was a labor dispute within the meaning of such section." We are unable to accord to the

contentions of appellees' counsel, urged in oral argument and in briefs filed, the conclusion reached by Judge Bricken as to such accord. As we interpreted the argument and briefs of counsel representing the appellees they strenuously contend that there is no labor dispute within the meaning of our statute and judicial interpretations thereof.

■ However, since the 1939 Amendment to Section 214, subd. A Title 26, Code of Alabama 1940, defining a "labor dispute" as the term is defined in National Labor Relations Act, 29 U.S.C.A. § 151 et seq., and the Norris-La Guardia Act, 29 U.S.C.A. § 101 et seq., it is our opinion that appellees' unemployment was directly due to a labor dispute. Section 214, subd. A supra. Badgett v. Department of Industrial Relations, 30 Ala.App. 457, 10 So. 2d 872; 243 Ala. 538, 10 So.2d 880; New Negro Alliance v. Sanitary Grocery, 303 U.S. 552, 304 U.S. 542, 58 S.Ct. 703, 82 L.Ed. 1012; Lauf v. E. G. Shinner & Co., 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872.

It is our opinion therefore that lower court erred in its reasoning that appellee's unemployment did not result directly from a labor dispute.

Conditions in addition to the worker's involuntary unemployment directly due to a labor dispute must be concurrently present under our law to bring about his disqualification to receive unemployment benefits. The labor dispute must be in active progress, and "in the *establishment* in which he is or was last employed." (Italics ours.)

There are no cases from either our Supreme Court, or this court, construing the meaning of the word "establishment," nor does the Act contain any definition.

■ The conditions disqualifying a worker from the benefits of our Act constitute exceptions thereto. Exceptions from legislation humanitarian and remedial in nature must be narrowly construed, giving due regard to the plain meaning of statutory language and legislative intent. Phillips, Inc. v. Walling, 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095, 157 A.L.R. 876, and in Canadian Pacific R. v. United States,

9 Cir., 73 F.2d 831, 834, the Circuit Court of Appeals for the Ninth Circuit declared:

"A proviso or exception which restricts the general scope of the act must be strictly construed, and will not be permitted to take any case out of the enacting clause which does not clearly fall within its terms, and the burden of proof is on one claiming the benefit of the proviso."

Our Unemployment Compensation Act was originally passed in 1935. It operated in a virgin field. England had originally and experimentally passed a similar system of law in 1911, which was revised as trial exposed weaknesses. Wisconsin passed such legislation in 1932. St.1945, § 108.01 et seq. The passage of the Social Security Act by Congress in August, 1935, 42 U.S. C.A. § 301 et seq., induced other states to enact such laws. Ours was perhaps the second state act in this country. All states now have similar acts including the basic requirements laid down by the Act of Congress, but differing widely in details which Congress left open to State legislation. While there is an immense body of decisional law in this field enunciated by the agencies to which its administration has been committed, there are comparatively few judicial interpretations.

The relative recency of the law and the paucity of judicial decisions thereon create historical nuances rather than historical facts, which are of only small import in a historical interpretation of the true purpose of the Act. As stated by the Superior Court of Pennsylvania in Bliley Electric Co. v. Unemployment Compensation Board of Review, 158 Pa.Super. 548, 45 A.2d 898, 902:

"Until more cases involving a wide variety of factual situations have been brought to the courts, judicial answers will necessarily lack the usual rigor of legal formulas, and tend to be tentative and groping in their nature. Concrete cases will develop general principles, and precise definition will issue from the wisdom acquired by greater experience."

The Tennessee Coal, Iron and Railroad Company has set up separate divisions for its operations:

1. The Manufacturing Division consists of all the coke ovens, blast furnaces, and finishing plants.

2. The ore mines and quarries divisions.

3. The Coal Mines Division.

4. The Rail Transportations Department.

There is also a health department, operating a large hospital, and an industrial relations department.

By a "chain of command" the management of all of the departments is directed into the office of the President who has general supervision and direction over all the business and operations of the company.

Evidence introduced by the appellants in the proceedings below tends to show that the operations of the company are planned on a yearly basis; that the functions of each department or division, particularly those concerned with production, are integrated and coordinated each with the other in a general schedule. For this reason the appellant contends that the coal mines are so functionally integrated and coordinated with the other departments and divisions that all must be considered as an integral of one operating unit or establishment.

On the other hand the appellees contend that in the above mentioned departments and divisions the respective employees are engaged in different occupations, and consequently belong to different unions, wholly separate and independent one of the other; that the Coal Mines Divisions is under the general superintendance of one man, whose authority does not extend to any other department; that this division promulgates its own safety rules and regulations; that each coal mine has its own superintendent whose authority extends to no other mine; that coal miners desiring employment with the Company apply to the Coal Mines Division; and that the mines are geographically separated from the other operating plants and mills of the Company. In short the appellees contend that there is such a degree of isolation in management and space that a concept of functional integrality cannot with propriety be applied so as to conclude that the coal mines were not a separate establishment in themselves.

The appellant earnestly asserts that the Wisconsin case of Spielmann v. Industrial Commission, 236 Wis. 240, 295 N.W. 1, necessitates a conclusion that the word "establishment" as used in our act includes all functionally integrated components of a single manufacturing unit, particularly in light of the fact that the Alabama Act, like the Wisconsin Act, St.1939, § 108.04, omits the words "factory, or other premises", found in many other state acts in addition to the word "establishment", and uses only the word "establishment." In this connection it should be noted that at least one court has taken the view that the words "factory", "establishment," or "other premises" as used in its Unemployment Compensation Act, Laws Alaska 1937, Ex.Sess., c. 4, as amended, were ejusdem generis, and that the principle of noscitur a sociis applies. See Aragon case, 9 Cir., 149 F.2d 447.

The facts upon which the Wisconsin Court [236 Wis. 240, 295 N.W. 3], found the two plants to be a single "establishment" are as follows:

"The employer is a Marlyand corporation and is engaged in, among other things, the manufacture of automobiles. It has a body plant in Milwaukee and an assembly plant at Kenosha. The employe worked at the Milwaukee plant.

"The Milwaukee plant is devoted exclusively to the manufacture of bodies for the several models of the employer's cars. The Kenosha plant is devoted exclusively to the manufacture of parts other than bodies, and to the assembly of the completed cars. There are no other plants of the employer engaged in automobile manufacture.

"Ninety-eight per cent of the cars are built against specific orders. Because of the numerous possible combinations in model, color, trim, accessories, etc., it is necessary that production schedules be carefully planned in advance. Accordingly the work of both plants is projected on a monthly, weekly and daily base by a central planning department located at the Kenosha plant. The production in each plant is highly synchronized and the work of the

two plants is so co-ordinated that a body built in the Milwaukee plant against a given car order will meet the chassis built in the Kenosha plant against the same order, pursuant to a prearranged schedule. *It is endeavored to keep the hourly rate of production of the two plants the same.*

"The two plants are approximately forty miles apart. The bodies are transferred from the Milwaukee plant to the Kenosha plant by trucks owned by the employer and driven by its employees. The employer has a General Works Manager in charge of the operation of the two plants." (Italics ours.)

The court found that because of the functional integrality, general unity, and physical proximity of the two plants they constituted one establishment.

In the course of its opinion the Wisconsin Court sets forth the following:

"The appellant urges eight facts that he claims show that the two plants do not constitute a single establishment: (1) 'The two are forty miles apart.' This is covered above. (2) 'Each has its separate wage and labor contract.' But each craft in a single plant may also have these. (3) 'Each has its own seniority and service records.' So has each craft in a single plant. Seniority rights in one craft give an employee no rights in any other craft. (4) 'Each has its own labor union to represent it.' So may each craft in a single plant. (5) 'Negotiations for working conditions in one are carried on without contact with the other.' So it may be as to each craft, or a separate department in a single plant. (6) 'An employee in one plant has no standing in the other.' Also an employee in one craft in a single plant has no standing in any other craft. (7) 'Each has its own hiring and firing department.' So may each department in a single plant. (8) 'In each the individual employee, his work, tools, hiring and discharge, immediate relationship with his employer is separate and distinct.' So they may be as to different crafts or departments in a single plant. As the same situations may exist as to different crafts or departments in a single plant, none of the things stated, and all of them together seem to us not to control the matter."

■ Upon a statute being adopted from another state it will be presumed to have been adopted with the *settled* construction placed on it by the courts of that state. (Italics ours.) Galloway Coal Co., v. Stanford, 215 Ala. 79, 109 So. 377. In Fuller v. Lanett Bleaching Co., 186 Ala. 117, 65 So. 61, Chief Justice Anderson wrote concerning the statute then under consideration:

"This is a literal reproduction of a Georgia statute which, at the time of adoption in this state, *had been often construed* by the Supreme Court of Georgia, and which said construction is at least persuasive that our Legislature intended to adopt it as construed in the jurisdiction from which it was borrowed." (Italics ours.)

The word "establishment" was in our Act when the same was adopted in 1935. The Spielmann case, supra, was not decided by the Wisconsin Court until 1940. A single case does not constitute a *settled* construction. These considerations considerably weaken the persuasiveness of the Spielmann case.

We note that the Wisconsin Court in the Spielmann case, supra, listed some eight factors on which the appellant in that case relied to show that the two plants did not constitute a single "establishment." Many of these factors are also present in the instant case. The Wisconsin Court attached little significance to these factors because they might also be present in each craft in a single plant, or in different departments in a single plant. This of course is true. Even so, it is our view that such possibility as mentioned by the Wisconsin Court does not destroy the value of the mentioned factors as indicating the true nature of the operational set up of a manufacturing business. If these factors are not of importance, then just what elements would furnish light as to the true situation?

The Supreme Court of Michigan in Chrysler Corporation v. Smith, 297 Mich. 438, 298 N.W. 87, 135 A.L.R. 900, considered the meaning of the word "establishment" as it appears in the Michigan Act, Pub.Acts 1936, Ex. Sess., No. 1, § 29(d), as amended by Pub. Acts 1939, No. 324,

which is highly similar to our Act. In that case a labor dispute actively in progress in the main plant stopped work in the eight other essential, coordinated plants of the Chrysler Corporation, all located in the Detroit area. The majority of the Michigan Court in its determination of the meaning of the word "establishment", as it appears in the Michigan Act, seems to have been persuaded by and to have adopted the conclusions of the Wisconsin Court in the Spielmann case, supra, that functional integrality and coordination is the primary test in interpreting the meaning to be attached to the word "establishment."

The degree of coordination, or integrations, certainly in the Spielmann case, supra, and inferentially in the Chrysler case, supra, is vastly different from the integration and coordination present in the instant case. In the Spielmann case the two plants were integrated on an hourly basis, ninety-eight per cent of the cars built against specific orders for cars of certain models, trims, color, etc.

In the present case the integration was between entirely different kinds of manufacturing enterprises.

To our mind there is a significant difference of degree between an assembly line integration of finished products, such at was present in the Spielmann Case, supra, and an integration of entirely different types of raw material production and processing plants as exist in this case.

Integration is often present where plants are operated by entirely different owners. Certainly under these conditions the test of functional integrality could not be said to cause such separately owned plants to constitute a single establishment.

Nor do we consider the fact that the ultimate management of the various enterprises of the Tennessee Coal, Iron and Railroad were pyramided into the office of the President determinative or of particular value in disclosing whether the coal mines operated by the company were a separate establishment. The record discloses that the Tennessee Coal, Iron and Railroad Company is wholly owned by and a subsidiary of the United States Steel Company. The United States Steel Company exercises control over the Tennessee Company only to the extent of promulgating general policies for the guidance of the self contained entities of the Steel Company. There is however an intimate contact between the Steel Company and the Tennessee Company through consultation and conferences between the officials of the two companies. Since it owns its subsidiaries there is no reason why the Steel Company could not pyramid the ultimate management of all its subsidiaries into one central head. Under this situation it could be reasonably argued, if the test of ultimate management be adopted, that all of these enterprises, different in kind and separated by vast distances constituted but a single "establishment."

It is therefore clear to us that the tests of unity of management and integrality of function, while furnishing aid in determining the true meaning of the word "establishment" as it appears in our Act, are essentially only rule of thumb tests.

On the other hand, the Illinois Supreme Court in Walgreen Co. v. Murphy, 386 Ill. 32, 53 N.E.2d 390, 394, had before it the question of whether a warehouse, a component part of a chain of retail drug stores, was an "establishment" under the Illinois Unemployment Compensation Act. Smith-Hurd Stats. c. 48, § 223(d). The warehouse was located several miles from the main office of the drug company. The warehouse was under a general superintendent who devoted his entire time to the management of the warehouse and exercised no authority incident to the operation of the retail drug stores. The Illinois Court concluded that the warehouse was a separate establishment in itself. In the course of its opinion the court wrote:

"The words 'establishment' and 'premises,' employed in section 7(d), are so commonly understood as units of place that further definition is superfluous. The words of a statute are to be taken in their ordinary meaning in general and popular use, unless a different meaning was intended, and such meaning must be accepted unless clearly wrong."

The court concludes that the complete geographical isolation of the warehouse

was sufficient to justify its classification as a warehouse.

In Phillips v. Walling, supra, the Supreme Court of the United States considered the meaning of the words "retail establishment", as it appears in Section 13 (a) (2) of the Fair Labor Standards Act, 29 U.S.C.A. § 213(a) (2), exempting from the operation of the Act employees "engaged in any retail * * * establishment."

The petitioner corporation in this case operated a chain of 49 retail grocery stores, and quite apart from these retail stores it maintained a separate warehouse and office building. Merchandise was supplied each store on requisitions prepared by the individual store managers, subject to revision by one of the superintendents in the central office, being thus clearly functionally integrated with the retail outlets.

In holding the warehouse not to be a retail establishment the court said [324 U. S. 490, 65 S.Ct. 809]:

"Petitioner claims that its retail stores, warehouse and central office together constitute a 'retail establishment' within the meaning of this exemption. * * * But if, as we believe, Congress used the word 'establishment' as it is normally used in business and in government—as meaning a distinct physical place of business—petitioner's enterprise is composed of 49 retail establishments and a single wholesale establishment."

When the above case was before Circuit Court of Appeals for the First Circuit, that court, in commenting on a legislative change in the phraseology of the Fair Labor Standards Act during its passage, wherein the word "establishment" was substituted for "industry" stated:

"Obviously, the word 'establishment' was never meant to mean an entire organization." Phillips v. Walling, 1 Cir., 144 F. 2d. 102, 105.

Section 183 of our Unemployment Compensation Act contains language clearly indicating a legislative concept of separate establishments within one employing unit, for that section concludes as follows:

"All individuals performing services within this state for any employing unit *which maintains two or more separate establishments* within this state shall be deemed to be employed by a single employing unit for all the purposes of this chapter." (Italics ours.)

It is also clear that under the statutes licensing and taxing chain stores in this state the term "establishment" as employed by the legislature in these statutes meant each geographically separated store, regardless of unity of management or ownership of the several stores comprising the chain. See Sections 620 through 627, Title 51, Code of Alabama 1940.

Had the various Unemployment Acts of the different states been in existence for a longer period of time so that they had progressed beyond the trial and error stage, then in our opinion the legislative histories of such acts, and the judicial interpretations of other jurisdictions would be of stronger significance. Our opinion is that the present stage necessarily invites that we interpret and give meaning to words in our Unemployment Compensation Act as they are commonly used and understood. Each case must be particularized on its own facts. This being so it is our further opinion that the coal mines in which the appellees were employed must, under the facts of this case, be considered as an establishment separate from the establishment or establishments in which a labor dispute was in progress.

While we disagree with the reasoning of the court below, and the basis of its conclusion, we think its conclusion is correct. The judgment should therefore be affirmed.

Affirmed.

BRICKEN, Presiding Judge (dissenting).

The appellant, Tennessee Coal, Iron & Railroad Company, is engaged in the production of steel in Jefferson County, Alabama, where it operates a large steel industry.

The production of steel requires that raw materials, limestone, ore and coal be assembled and processed. The ore furnishes the iron content. Coal is one of fuel for heating in the reduction and limestone is a flux.

The ore, and the coal after conversion into coke and the flux is processed through a blast furnace producing pig iron which is in turn processed in the open hearth furnace into steel ingots, which is later processed through various mills and converted into steel products.

The company sells no ore, coal, coke or limestone or pig iron as such. The mining and transportation of the ore, coal and limestone, and their conversion into pig iron are all a part of one operation designed to accomplish but one thing, namely, the production of steel ingots. Each operation is necessary and essential to the production of steel ingots, and if any operation is interrupted, all related operations are vitally affected.

The various units of the industry are located at different places. The ore mines are in one place. The coal mines in another. Limestone is quarried in still another locality. The furnaces are located roughly near the center of territory from whence the raw materials are obtained. These units are connected by a standard gauged railroad operated by the company and the result of their collective functioning is the production of steel ingots.

Employees engaged in mining coal are affiliated with the United Mine Workers of America ( A. F. of L.), the certified bargaining agent for the coal miners. Employees engaged in mining ore belong to the International Union of Mine, Mill and Smelter Workers (C. I. O.). Employees working in the furnaces and mills are members of the United Steel Workers of America (C. I. O.). Employees who operate the railroad are members of different railroad unions. The labor organizations are separate and distinct organizations and act independently in representing their members. For instance the United Mine Workers negotiate a contract relating to wages, hours and working conditions of coal miners. The ore miners have a contract relating to workmen mining ore, and the Steel Workers negotiate a contract for the steel workers.

From January 21st to February 18, 1946, the Steel Workers and the ore miners were on a strike. The Coal Miners did not participate in the strike, nor were they responsible in any degree for the strike that directly and effectively prevented the operation of the coal mines and other units of the industry.

Burney Martin and the other appellees, coal miners, were idle during the period mentioned due directly to said strike. They filed claims for unemployment compensation under Title 26 of the Code of Alabama of 1940. Their claims were denied by the Director of Industrial Relations, who was overruled by a majority of the Board of Appeals, which was in turn sustained by the trial court on a trial de novo, where the claims were allowed. That ruling is now here for review.

This case was ably argued on submission and counsel for the respective parties have shown commendable industry in presenting in the respective briefs all available precedent and treatises that shed light on the controversy.

Counsel have reviewed Department of Industrial Relations v. Pesnell, 29 Ala. App. 528, 199 So. 720, certiorari denied 240 Ala. 257, 199 So. 726; Department of Industrial Relations v. Drummond, 30 Ala. App. 78, 1 So.2d 395; Id., 241 Ala. 142, 1 So.2d 402; and Badgett v. Department of Industrial Relations, 30 Ala.App. 457, 10 So.2d 872; 243 Ala. 538, 10 So.2d 880; and counsel for appellees insist that the claimant was disqualified in the Pesnell and Badgett cases because the claimant in each of these cases also participated in the labor dispute, and that the ruling in the Drummond case was that a labor dispute in which the claimant does not participate does not disqualify the claimant; it is earnestly insisted here that this case is ruled by the Drummond case.

The Alabama Unemployment Compensation Law was amended and revised in 1939. Prior to that amendment the Pesnell case had been decided in the circuit court of Jefferson County, Alabama, and the claim allowed. This decision was rendered on July 22, 1939. Following that decision in the trial court the Legislature of Alabama saw fit to amend the Alabama Unemployment Compensation Law by an Act which was approved on September 21, 1939, Acts

1939, page 721, which is now codified as Section 214, subd. A. Title 26 of the Alabama Code of 1940. This Section relates to the disqualification of an individual for benefits for total or partial unemployment which reads as follows:

"Section 214. Disqualification for benefits.—An individual shall be disqualified for benefits for total or partial unemployment:—

"A. For any week in which his total or partial unemployment is directly due to a labor dispute still in active progress in the establishment in which he is or was last employed; for the purposes of this section only, the term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee. This definition shall not relate to a dispute between an individual worker and his employer."

The parties to this appeal seem to be in accord to the effect that the section quoted requires the existence of five separate and distinct conditions to disqualify a workman suffering involuntary unemployment from benefits for total or partial unemployment, namely, (1) the unemployment must be directly due, (2) to a labor dispute, (3) in active progress, (4) in the establishment, (5) in which he was last employed.

The language employed in the Act seems designed for that purpose.

The parties also seem to be in accord that the strike above referred to was a labor dispute within the meaning of said section. The evidence shows clearly that the sole cause of claimant's unemployment was the strike above referred to and that there was no intervening cause such as was found to be present in the Drummond case. It is therefore quite clear that the unemployment was directly due to that labor dispute and that the labor dispute was in active progress at the time of claimant's unemployment.

There is serious difference between the parties as to whether or not the labor dispute was in progress "in the establishment" in which the claimant was employed, but there is no dispute that if the facilities above described were an "establishment" within the meaning of the Act that the claimant was employed in the coal mining unit above referred to.

The insistence of the appellant is that the statute was amended to disqualify a claimant whose unemployment was directly due to a labor dispute in active progress without regard to whether the claimant participated in the dispute.

The appellees insist that the statute should be construed to mean that a labor dispute in which the claimant does not participate does not disqualify the claimant.

Apparently there are two schools of thought concerning unemployment compensation legislation. One school maintains that such legislation should protect the worker against loss of employment brought about by economic conditions; the other believes that compensation should be paid whenever there is unemployment, whatever the cause may be, other than voluntary act of the unemployed. Both schools of thought have succeeded in having their ideas enacted into the law in various jurisdictions.

The responsibility for legislation of this kind rests with the Legislature. The courts are not concerned with the wisdom of the law nor is the court authorized by construction to make the law cover cases not provided for by the law itself.

We are of the opinion that the Legislature has said in plain and unambiguous terms in the language quoted that if the unemployment is directly due to a labor dispute in active progress in the establishment in which the employee was last employed, that the State fund shall not be called upon to make payments. Had the Legislature intended that the employee must participate in the dispute or benefit by it or finance it in order to be disqualified it could have so provided. Its omission in this respect is significant and we know of no authority in this court to supply omissions that were apparently design-

edly made by the Legislature in enacting the statutes quoted. After all, the question of qualification or disqualification is a matter for the Legislature. The whole system of unemployment compensation is statutory in origin. Without a statute on the subject no right to compensation exists. We must, therefore, conclude that when the Legislature omitted any reference to participation in the labor dispute mentioned in the statute the Legislature never intended to make participation in the dispute a condition to disqualification of the claimant.

This conclusion leaves but one other question for consideration and that is, whether or not the labor dispute was in active progress "in the establishment" in which the claimant was last employed. So far as we have been able to find there are no decisions of this court, or the Supreme Court of Alabama, defining the word "establishment" as it is employed in the statute quoted. This portion of the Act seems to be patterned after a similar law in the State of Wisconsin. In such circumstances the Wisconsin case of Spielmann v. Industrial Commission, 236 Wis. 240, 295 N.W. 1, defining the word "establishment" as used in the Wisconsin statute, may be looked to. We are of the opinion that an establishment may consist of one or more units and that the facilities for making steel employed by the Tennessee company to that end constitutes the "establishment" within the purview of the Act. See also, General Motors Corporation v. Mulquin, et al., 134 Conn. 118, 55 A.2d 732.

Judgment of the Circuit Court allowing the claims of appellees is reversed and a judgment here rendered denying said claims.

Extended opinion by BRICKEN,
Presiding Judge.

The above opinion was written as the opinion of the court. My colleagues, however, differ with that part of the opinion in which it was stated that the facilities for making steel by the Tennessee Company, including the coal mines, constitute an "establishment" within the provisions of the Act. I dissent from this holding of my colleagues.

The testimony in this case shows without dispute that all of the units of the Tennessee Company's facilities for making steel are completely integrated and the operation of all of them are closely synchronized and coordinated.

The testimony shows that the operations of the company are planned a year in advance and are based upon the amount of steel ingots to be produced per month. A schedule of operations for the coal mines, ore mines, limestone quarries, blast furnaces, open hearth furnaces, and railroad transportation system is made up at that time in order that the proper amount of raw materials may be produced and delivered by the rail transportation system at the proper time and to the proper place in order to produce the required tonnage of steel ingots.

A meeting was held each month at which were present representatives from the coal mines, ore mines, blast furnaces and rail transportation department. This meeting was held to discuss the problems of each department and to plan close coordination of each to schedule the production for each department.

Once a week a meeting was held at which were present representatives from each of these departments to plan the operations for the next week. The meeting was presided over by the Vice President in charge of operations. There was determined which blast furnaces would operate the following week, how much coke would be needed, how much ore would be needed and how much coal would be required. The schedule of each of the mines and quarries for the next week was determined and the schedule of operations of the rail transportation department was set to deliver at the exact time needed for daily production the amount of raw materials needed.

Without dispute, the coal produced in the Tennessee Company's mines was metallurgical coal. All of the coal produced with the exception of that used in boilers was used by that company in the production of coke, which, in turn, was used in the production of steel. The arrangement

of the coal mines of the Tennessee Company was such that no coal could be stored at the mines. As the coal was brought to the surface, it was loaded into the company's own coal cars and taken directly to the coke plant over the company's own railroad facilities. There were no transportation facilities at the coal mines except the rail transportation system of the company. This was due to the fact that the plan of operation of the company was that the coal, as soon as it was washed at the coal mines, was to be transported directly to the coke plant.

Unless the transportation system could function and transport the coal to the coke works as soon as it was washed, then the coal mines could not operate. This part of the transportation system was as much a part of the coal mines as the tipples, the hoist, the mine cars and tracks.

A strike, such as occurred in this case, by the employees of the rail transportation department would and did cause a complete shut down of the coal mines just as effectually as would a strike by the employees who transport the coal from the bottom of the mines to the surface. A strike by the employees at the coke works, whose duty it was to unload the coal as it comes from the coal mines and to charge it into the coke ovens, would close down the coal mines just as effectually as would a strike of the employees whose duty it was to load the coal at the mines into coal cars. A strike of the rail transportation employees and of the coke oven employees would also close down the blast furnaces, the open hearth furnaces, and the ore mines, because they could not operate unless coal was transported to the coke ovens, made into coke, and carried to and charged into the blast furnaces with ore from the ore mines. It takes all of these units to make the establishment for the production of steel. The various units were so coordinated that none could operate unless the others also operated. The blast furnaces could not operate unless the ore and coke were produced and delivered when necessary to charge the furnaces. The coke ovens could not produce the coke unless the coal was delivered. The coal mines could not operate unless the rail transportation

department operated, so as to transport to the coke works regularly car by car the coal as it came to the surface, was washed and loaded into the coal car.

In my opinion, all of these units of the steel making facilities of the Tennessee Company were thoroughly integrated and operations coordinated to the end and purpose of producing steel and together they constituted an "establishment" within the purview of the statute.

My colleagues refuse to follow the decisions of the Supreme Courts of Wisconsin and Michigan on the theory that, "The relative recency of the law and the paucity of judicial decisions thereon create historical nuances rather than historical facts, which are of only small import in a historical interpretation of the true purpose of the act." In my opinion the history of unemployment compensation acts shows clearly that the decisions of the Supreme Courts of Wisconsin and Michigan cited above are sound and should be followed by this court.

The first unemployment compensation law was the British National Insurance Act of 1911, which is set out in Vol. 49, Law Reports, 1–2 Geo. V. C. p. 424; Section 87 of that Act disqualifies for benefits any workman who has become unemployed by reason of a stoppage of work due to a trade dispute at the "factory, workshop, or other premises" at which he is employed. The section then concludes as follows: "Where separate branches of work which are commonly carried on as separate businesses in separate premises are in any case carried on in separate departments on the same premises, each of those departments shall, for the purpose of this provision, be deemed to be a separate factory or separate premises, as the case may be." In 1924 this law was amended by inserting in it a provision relieving from the disqualification clause in the event the claimant of benefits "proves that he is not participating in or financing or directly interested in the trade dispute which caused the stoppage of work and that he does not belong to a grade or class of workers members of which are participating in or financing or directly interested in the dispute."

514

British Unemployment Insurance Act 1924. Vol. 62, Law Reports, C. 30, p. 168.

The law was further amended in 1935, broadening its scope in many respects but retaining verbatim the disqualification clause of the 1911 Act and the provision of the 1924 amendment as to exceptions to the disqualification clause.

In the United States the first unemployment Act was adopted in Wisconsin in 1932. It was based largely upon the British Act of 1924, but eliminated from the disqualification clause the words "factory, workshop or other premises" and substituted the single word "establishment." It also omitted entirely the provisions relieving from the disqualification clause in the event the employee or members of his grade or class of workers did not participate in or finance, or were not directly interested in the labor dispute, and omitted entirely the "separate branch" provision.

Upon passage of the Federal Act in 1935, the Social Security Board prepared a proposed draft for adoption by the States. This draft was based very largely upon the British Act of 1924, as amended. It contained almost verbatim the disqualification clause of the British Act, including the provisions relieving an employee from the disqualification clause in the event he or members of his grade or class of workers did not participate in or finance the labor dispute and the "separate branch" provision.

A number of States of the United States adopted almost verbatim the suggested draft prepared by the Social Security Board, including the provision relieving from the disqualification clause and the "separate branch" provision.

When the Alabama Legislature adopted its Unemployment Compensation Act in 1935, it patterned that act very largely on the Social Security draft, which was based upon the British Acts. The Alabama Legislature, however, patterned its disqualifi· cation clause after the Wisconsin Act, and like Wisconsin omitted entirely the provision relieving from the disqualification clause in the event the employee did not participate in or finance or was not interested in the labor dispute and also, like

Wisconsin, used the single word "establishment" and omitted the "separate branch" provision.

It is significant that the Alabama Legislature while adopting most of the Social Security Board's draft, omitted those provisions of that draft which relieved employees not at fault from the labor dispute disqualification clause, and omitted the "separate branch" provision.

It is familiar law that where a Legislature adopts in substance a statute of another State or country but omits a proviso attached to that statute, the statute as adopted will be construed as excluding the matter in the proviso. This has been clearly held by the Supreme Court of Alabama in the case of Howell's Mining Co. v. Gray, Chief Mining Inspector, 148 Ala. 535, 42 So. 448.

The responsibility for legislation of this kind rests with the Legislature. The courts are not concerned with the wisdom of the law, nor is the court authorized by construction to make the law cover cases not provided by the law itself.

The cases cited by my colleagues are not in conflict with this opinion or with the decisions of the Supreme Courts of Wisconsin and Michigan.

In the case of Walgreen Co. v. Murphy, 386 Ill. 32, 53 N.E.2d 390, 392, a strike occurred in a warehouse operated by the Walgreen Company. · The striking employees filed claims for unemployment benefits. They contended that the warehouse was only one unit in an establishment which included some 240 retail stores and that since these retail stores continued to operate, there was no "stoppage of work" in the establishment within the meaning of that term as used in the Illinois Act. The Supreme Court of Illinois held that it was not necessary in order for striking employees to be disqualified from benefits that the employer's operations in all their ramifications should be completely shut down. On the question of the establishment, the court said:

"For the year ending September 30, 1941, net sales of the warehouse aggregated approximately $23,000,000. Of this total, about $13,000,000 represented sales to re-

tail stores of the company and the greater part of the remainder to other retail customers. The warehouse employs an average of 350 employees. It maintains and keeps its own records. The warehouse employs its own watchmen, engineers and maintenance crew. Other drug warehouses in the metropolitan area commonly operate as separate businesses. Retail drug stores in the Chicago area generally operate without a warehouse. The company's retail stores could operate if the warehouse ceased doing business. Similarly, the warehouse could continue to operate if the company's stores ceased operations. The retail stores continued normal operations during the strike and, apparently, could have continued to do so indefinitely. The relationship between the warehouse and the retail stores is no closer functionally than exists between independent drug wholesalers and their retail customers."

On this finding the court held that the warehouse was an establishment separate from the retail stores and that this was true specially in view of the fact that the Illinois Act contained the "separate branch" provision, which was omitted by the Alabama Legislature from our Act. There can be no quarrel with the court's conclusion, but it has no application to a situation of closely integrated operations such as we have in the present case, where one could not operate if others closed.

In the case of Phillips, Inc. v. Walling, 324 U.S. 490, 491, 65 S.Ct. 807, 89 L.Ed. 1095, 157 A.L.R. 876, cited by my colleagues, the Supreme Court of the United States held that the exemption from the Fair Labor Standards Act of employees engaged in a retail ·establishment did not exempt employees of a warehouse whose business was entirely wholesale and was interstate. The Supreme Court of the United States pointed out that the congressional debate on which they based their decision showed conclusively that Congress, when it placed in this Act the exemption of employees of a "retail establishment" had in mind small individual stores, filling stations and separate purely retail outlets chiefly located near State boundaries. This is also pointed out in the later decision of the Supreme Court of the United States

in Roland Electrical Co. v. Walling, 326 U. S. 657, 66 S.Ct. 413, 419, 90 L.Ed. 383. As the Supreme Court said in this later decision, "There never was an intent expressed to exempt retailers other than the local ·merchants of the type dealing with the ultimate consumer." It is clear from reading these decisions and from the Act itself that the exemption contained in the Fair Labor Standards Act was not intended to exempt employees engaged in wholesale activities, which are a part of interstate commerce. The cases growing out of construction of the words "retail establishment" under the Fair Labor Standards Act are entirely inapplicable here.

For reasons stated, I do not concur in the opinion of my colleagues in holding that the steel making facilities of the Tennessee Company are not in "an establishment" within the purview of our statute.