1 So.2d 395

**DEPARTMENT OF INDUSTRIAL RELATIONS v. DRUMMOND.**

6 Div. 616.

Court of Appeals of Alabama.

Feb. 4, 1941.

Rehearing Denied March 4, 1941.

Lange, Simpson, Brantley & Robinson and Jas. A. Simpson, all of Birmingham, and Frank R. Broadway and J. Eugene Foster, both of Montgomery, for appellant.

Ralph W. Quinn, Herbert R. Maulitz, and Wm. F. Spencer, all of Birmingham, for appellee.

SIMPSON, Judge.

This is a suit by appellee for benefits allegedly due under the Alabama Unemployment Compensation Act, General Acts 1935, p. 950 et seq., No. 447. From a judgment below awarding appellee compensation this appeal proceeds.

This cause and that of Department of Industrial Relations v. Pesnell, Ala.App., 199 So. 720, were argued and submitted at the same hearing. The question here is whether the unemployment of appellee was directly due to the labor dispute, held to have prevailed in the Pesnell case, supra, so as to render him ineligible for compensation under the Act—as that term is employed in Section 6(d) thereof, p. 958, which is: "(d) During Trade Disputes. An employee shall not be eligible for benefits for any week in which his total or partial unemployment is directly due to a labor dispute still in active progress in the establishment in which he is or was last employed."

The appellee was an employee of Wylam Mine No. 8, which mine, along with Edgewater under discussion in the Pesnell case, was a coal mine of the Tennessee, Coal, Iron and Railroad Company (T. C. I). The situation, related in the Pesnell opinion, regarding the work contract with the United Mine Workers of America, the closing notices, etc., at Edgewater also existed at Wylam Mine. So, for brevity, we incorporate by reference those facts for this opinion.

As at Edgewater, on March 31, 1939, the Tennessee Coal, Iron and Railroad Company caused to be posted a similar written notice of closing at the Wylam Mine and from time to time, during the negotiations for a new Appalachian contract with the United Mine Workers of America, similar notices continued to be posted. Upon the execution of the new work agreement with the United Mine Workers of America, as detailed in the Pesnell opinion, Wylam Mine, as did Edgewater in the Pesnell case, resumed operations on May 13, 1939.

Unlike Pesnell, however, the appellee, here, was not a member of the United Mine Workers of America—held in the Pesnell case to have been engaged in a labor dispute—and was in no way interested or concerned in those negotiations, either personally or by organization affiliation. This appellee was a member of the Captive Coal Miners' Union, an affiliate of the American Federation of Labor (A. F. of L.), and neither he nor his union was in any disagreement or labor dispute of any character with the employer or anyone else. There were employed at the Wylam Mine members of the United Mine Workers of America (a C. I. O. organization and Pesnell's union), members of the Captive Coal Miners' Union (affiliate of the A. F. of L. and appellee's union), and nonunion employees. When the employer, T. C. I. Company, posted the closing notice at Wylam No. 8, all of these employees were thrown out of work, with the exception of a few, retained for "necessary repairs, maintenance and construction work."

The record is further clear that appellee and his organization had an existing contract under which they were working, were in no disagreement of any character with the employer or anyone, wanted to continue to work and urged the employer to allow their employment to so continue, irrespective of the conduct, contract or attitude of the United Mine Workers of America. For reasons of its own, however, and utterly beyond the control of appellee or his union, this was not compatible with the wishes of the employer and hence the closing of the mine and the resulting unemployment of appellee.

In explanation of the complete shutdown of the mine and the consequent unemployment of appellee and others, in no way involved in the so called "labor dispute", Mr. Abbott, vice-president of the employer company, testified: "The question of whether or not we would attempt to operate our coal mines after March 31st if no contract (with U. M. W. A.) was arrived at had been pretty well decided before we met for the preparation of these notices. * * * We thought that in view of the fact that there were two factions or two unions in our coal mines, that the prob-

ability would be that if we attempted to operate, we would have violence and possibly bloodshed. * * * There had not been anything out of this particular strike or situation at that time that would lead us to believe anything like that would happen, but all of our previous experience with previous strikes led us to believe that it would happen."

It thus appears that, because of the apprehension of the employer company that to allow some employees to work when others (the C. I. O. affiliates) were on strike would result in violence, the appellee was locked out of work by the published notices and close down of the Wylam Mine. This, therefore, was the *direct* cause of appellee's unemployment and not the "labor dispute" in which the C. I. O. affiliates were involved. The trial court therefore, in our opinion, correctly held, and this court also finds the fact to be, that appellee's unemployment was not "directly due to a labor dispute still in active progress in the establishment in which he is or was last employed."

■ True, the origin of the disaffection may have been the trade dispute or disagreement between the employer and the United Mine Workers of America, but to us the conclusion is inescapable that the Legislature never intended that one, who has purchased his protection against involuntary unemployment, should be denied those benefits because of a "labor dispute" in which he was in no way involved and the causes of which unemployment he, his agents or organization were powerless to avert. To conclude otherwise, it appears to this court, would be to defeat the true and beneficent purposes of the statute and convert that statute into a sham and a mockery with respect to those industrial employees, as appellee, whom it must have been designed to protect against the hazards of enforced unemployment, the causes of which they were helpless to avoid. If such were not so, then a situation could be conceived and easily executed whereby a few persons could accomplish the unemployment of hundreds of innocent victims, entirely faultless in the matter, and thereby deprive them of compensation benefits which they had bought and paid for.

■ In determining the meaning of a statute, the court will consider the external, historical facts which led to its enactment, Southern Express Co. v. I. Brick-

man & Co., 187 Ala. 637, 65 So. 954; American Bakeries Co. v. City of Opelika, 229 Ala. 388, 157 So. 206; and so construe it as to effectuate the purpose of the Legislature in passing it, Lynn v. Broyles Furn. Co., 3 Ala.App. 634, 57 So. 122; Ward v. State, 17 Ala.App. 170, 82 So. 660, 662, certiorari denied 203 Ala. 306, 82 So. 662; Allgood v. State, 20 Ala.App. 665, 104 So. 847; "an interpretation should never be adopted which would defeat the purpose of the statute, if any other reasonable construction may be given to it, (The Emily) 9 Wheat. 381 (6 L.Ed. 116) ; and * * * the literal interpretation of an act is not always that which either reason or the law approves. The inartificial manner in which many of our statutes are framed, the inaptness of expressions frequently used, and the want of perspicuity and precision not unfrequently met with, ofter require the court to look less at the letter or words of the statute, than at the context, the subject-matter, the consequences and effects, and the reason and spirit of the law, in endeavoring to arrive at the will of the law giver." Thompson v. State, 20 Ala. 54, 62; Crosby v. Hawthorn, 25 Ala. 221; Davis & Co. v. Thomas, 154 Ala. 279, 45 So. 897; State v. Dodd, 17 Ala.App. 20, 81 So. 356; Nunez v. Borden, 226 Ala. 381, 147 So. 166.

■ The evident and well recognized purpose of the Alabama Unemployment Compensation Law, harmonious and responsive to the Social Security Legislation of the National Congress, was to insure the diligent worker against the vicissitudes of enforced unemployment, whether he be from office or shop, union or non-union. Certainly, if he can be rendered ineligible for benefits under the Act by such unemployment, precipitated by some other agency to which he owes no allegiance and in whose purposes he is in no way concerned, the prime objective of the Act would be defeated. It would be insurance which does not insure, protection which does not protect, and to such workers, many of whom are economically unable to stand the rigors of enforced idleness, this statute would "become as sounding brass, or a tinkling cymbal." Such could not be the purpose or policy of the statute, if due and fair consideration is to be accorded those whose wages or earnings were contributed (to the trust fund created in the Act), for the supposed purpose of purchasing insurance against the evil day of their involuntary idleness.

The ingenious argument of the able counsel for appellant that for this case, as regards the status of appellee, we adopt for construction, here, the definition of a labor dispute as used in the Norris-La-Guardia Act, 29 U.S.C.A. § 113(c), and National Labor Relations Act, 29 U.S.C.A. § 152(9), is unconvincing. Irrespective of whether or not these definitions, if applied to this case, would aid in controlling the question, the term, as there used, is expressly restricted to and subsumed under the declared policy and purposes of the Acts, themselves, which are, among other benefits sought to be accorded the worker, preservation and encouragement of the right to organize and bargain collectively. Thus the broad and flexible definition comprehended in the Federal Acts and variously approved by judicial construction. But it is unwarrantable that such statutory definition, obviously given a comprehensive meaning in the Federal Law seeking to benefit the worker, should be torn from its original setting and, by judicial interpolation, be read into the Alabama Act so as to be destructive of the elemental purpose of that Act, i. e. the relief of unemployment.

In the case of Kieckhefer Container Co. v. Unemployment Compensation Commission, 125 N.J.L. 52, 13 A.2d 646, 647, an analogous question was presented, where the "labor dispute" disqualification clause of the New Jersey Unemployment Compensation Statute was under consideration by the Supreme Court of that State. While such clause in the New Jersey Statute, N.J.S.A. 43:21–5(d) (1, 2), is not altogether similar to that of the Alabama Act, the view expressed by that court with reference to an almost identical situation as the appellee's plight here (in that case a non-union employee rendered unemployed by reason of a strike of the union employees and the consequent shutdown of his establishment) strongly supports the conclusions reached in the case at bar by this court. The court, opinion by Justice Donges, held: "The clear meaning of the language is to confine disqualification to those who are creating the dispute or participating therein in order to enforce their demands. To accept the prosecutor's construction would render every employee of a business, some of whose employees went on strike, ineligible for benefits, notwithstanding his non-participation therein and even though he might be opposed to the labor dispute and decline to have any part therein. The use of the words 'directly interested in the labor dispute' clearly limits their application to those employees directly interested in its furtherance by participation and activity therein."

Our research has failed to discover any other reported case dealing with the question by the appellate courts of other jurisdictions.

We are not in accord with the view of appellant and the judgment of the trial court is affirmed.

Affirmed.

RICE, Judge (concurring).

If we are to meticulously regard the exact wording of the statute, as so forcefully argued by Presiding Judge BRICKEN, then it is my opinion that the unemployment of the appellee was not "*directly*" due to a labor dispute", but was, rather "*indirectly*" due to a labor dispute"—as cogently illustrated by Judge Simpson's opinion.

And so far from extending the scope and effect of the Act in question by *interpretation,* as asserted in the dissent of our Presiding Judge, I think the exposition and application of same made by Judge Simpson merely follows the accepted rules of canonical construction.

I concur in his opinion and decision.

BRICKEN, Presiding Judge (dissenting).

I do not concur in the above opinion. It is clear to me that the controlling question involved upon the appeal in this case has been definitely settled, and determined, in the case of Department of Industrial Relations v. Alton Rufus Pesnell, 29 Ala.App. 528, 199 So. 720, certiorari denied Ex parte Pesnell, 240 Ala. 457, 199 So. 726.

It affirmatively appears, this case was tried in the lower court jointly with the Pesnell case, supra, Pesnell being a member of United Mine Workers of America, and William M. Drummond, this appellee, being a member of the Brotherhood of Captive Mine Workers, an affiliate of American Federation of Labor.

The Pesnell case was submitted in this court at the same time as this appeal, and both cases are based upon practically the same facts, the variation being slight and of no material consequence.

This court judicially knows, for it is generally known and the common knowledge, of every person of ordinary understanding

and intelligence, that the employer's coal mines, together with the coal mines of every other coal producer in the United States, during the period of time upon appellee's claim for compensation was based, were shut down, for reasons disclosed upon the trial of these cases in the lower court; and set out in the record. In the Pesnell case, supra, this court and the Supreme Court, in the cases, supra, have held that a labor dispute was the cause of the mines shutting down and ceasing to work.

I again state that the Pesnell case, supra, is direct authority to sustain the writer's position, in this connection, and, in furtherance thereof I extend this dissenting opinion as follows.

"Benefits" are defined in the Alabama Unemployment Compensation Law as "the money payable to an employee as compensation for his wage losses due to unemployment *as provided in this Act.*" Acts 1935, pp. 950, 951.

In section 6 of the same act under the heading "Benefits Eligibility Conditions" in subsection (d) it is provided: "(d) During Trade Disputes. An employee shall not be eligible for benefits for any week in which his total or partial unemployment is directly due to a labor dispute still in active progress in the establishment in which he is or was last employed."

Admittedly the employer was compelled to close its Edgewater Mine because of a labor dispute between the United Mine Workers of America and the operators in the Appalachian area as was decided in Department of Industrial Relations v. Pesnell, 29 Ala.App. 528, 199 So. 720. It, therefore, follows that appellee's unemployment was directly due to a labor dispute.

By application of certain well recognized rules of construction to the statute, my associates reach the conclusion that the statute does not mean what it says, that is, it does not render the employee ineligible to benefits unless he is a party to or in some way responsible for the labor dispute. To hold otherwise, it is claimed, would defeat the prime objective of the act and result in "insurance which does not insure, protection which does not protect."

If the statute was ambiguous or uncertain in any degree, resort to rules of construction would be in order. But such is not the case. The statute is plain, unambiguous and as certain as our language can make it. In such circumstances there is no occasion for resort to rules of construction. We must hold that the Legislature meant what it said.

This court has no legislative power. It should refrain from even any attempt to usurp it. It is not permissible for us, under the guise of construing a statute, to amend it. We need not look for any intention beyond the intention disclosed by the language employed. We ascertain what the Legislature intended by what the Legislature said. In this instance the Legislature did not confine disqualification to those creating the dispute or participating therein in order to enforce their demands. The responsibility for that is on the Legislature—not on this court. We are powerless to extend the scope and effect of an act by interpretation.

If it be said that this construction would render every employee of a business, some of whose employees went on a strike, ineligible for benefits, notwithstanding nonparticipation therein and even though he might be opposed to the labor dispute and decline to have any part therein, the answer is that unemployment *"directly due to a labor dispute"* is not one of the hazards insured against. The Legislature saw fit to exclude that hazard from coverage. The Legislature may have been informed that increased contributions by employer and employee would be necessary if that hazard was included along with others, or it may have reached the conclusion that fairness and justice require all the employees of a business to share in the loss resulting from a shut-down, if any one of them is responsible for it. As to that we do not know. What we do know is the Legislature said loss directly due to a labor dispute is not compensable. It did not say loss due to a labor dispute created or participated in by the claimant is not compensable. The Legislature did not see fit to impose the burden on the court of ascertaining whether the claimant created or participated in a labor dispute. The statute indicates an intention on the part of the Legislature to eliminate any such issues in matters of this kind. If there was a labor dispute which directly caused the unemployment, that is the end of the story. No provision is made for ascertaining whether the claimant created or participated in it.

If it be said this is a hard case, we would remind those responsible for such suggestion that hard cases are likely to make bad law, if emotions rather than frankly facing

84

84 realities as disclosed by the statute itself control. It is generally recognized in the business world that one is not entitled to more than is fairly paid for. Unemployment compensation is not a donation by the State. It is a form of insurance purchased through contributions by employer and employee pursuant to legislative provisions. Compensation for unemployment directly due to a labor dispute is one of the things the Legislature did not authorize. It is a risk or hazard expressly excepted by the Legislature. However, much we might be inclined to reach a different conclusion, if we were a legislative instead of a judicial body, we are limited in this case by the act of the Legislature. This court is as powerless to extend the statute to cover cases excepted from it, as it was to enact a statute on the subject of unemployment compensation in the first instance. If the statute works a hardship, relief must come from the branch of government responsible for the hardship being included in the statute. Being of the opinion that the statute is its own interpreter and that no situation is presented which calls for the application of any rules of construction, it follows, that in my opinion, the judgment appealed from should be reversed and one here rendered for appellant as was done in the Pesnell case, supra.

On Rehearing.

PER CURIAM.

■ While adhering to our views heretofore expressed; but, solely for the purpose of these further observations, let us suppose, as so forcefully urged by our Presiding Judge in his dissenting opinion, that "the statute is its own interpreter and that no situation is presented which calls for the application of any rules of construction." What, then, do we find the situation to be? Just what does the statute say? It declares that an "employee shall not be eligible for benefits for any week in which his * * * unemployment is directly due to a labor dispute."

Now, what does the word directly mean? It means, according to Webster's New International Dictionary, Second Edition, "In a direct manner; in a straight line; without deviation of course; wholly; completely; in a direct way; without anything in-

tervening." Similar definitions may be found in Black's Law Dictionary and others.

Now, apply any one of these definitions to the word "directly," as it appears in the quoted clause of the Act, and what do we find? Is it not plain that the "labor dispute" between the employer and the United Mine Workers of America might have endured for a thousand years without ever causing the unemployment of appellee? In fact, it would, or could, never have caused it, without the *direct* intervention or superimposition of the unpredictable, personal idiosyncrasies of whoever happened, at the time, to be the operation manager of the employer.

*Directly,* the labor dispute in question *could* never, *did* never, cause appellee's unemployment. To the contrary, it was caused, as appears and as this court found the fact to be, *solely* by the apprehension of the employer's general manager—and this whether or not such apprehension were real or whimsical.

Such unemployment is not exempt from the benefits of the act in question.

■■ We are constrained, however, to reiterate that "employee", as used in the clause of the statute, quoted, is not so clear and unambiguous in meaning as to preclude the application of well known rules of construction. If the Legislature had intended that "employee" be all inclusive, covering employees not involved as well as those concerned in the controversy—and thereby partially defeat the true purpose of the act—apt and unambiguous terms could, and should, have been employed expressive thereof. And so, in attempting its proper interpretation, we should consider "the external, historical facts which led to its enactment"; that its essential purpose was to minimize the harmful effect on society of unemployment; that it is, in character, a form of insurance for the unemployed worker, is remedial in nature, and should be liberally construed in his favor. And when so construed there is but one conclusion.

Benefits under the act are due appellee. He should be paid.

Opinion extended. Application overruled.

BRICKEN, P. J., dissents.