114 So.2d 533

## UNITED STATES STEEL CORPORATION

v.

## Cecil M. WOOD and Department of Industrial Relations.

6 Div. 463.

Court of Appeals of Alabama.

March 25, 1958.

Rehearing Denied May 13, 1958.

Reversed After Remandment Sept. 1, 1959.

Rehearing Denied Sept. 15, 1959.

1. Ante, p. 428.

Cooper, Mitch & Black, Birmingham, for appellees.

Wm. Henry Beatty, Samuel H. Burr and Burr, McKamy, Moore & Thomas, Birmingham, for appellant.

CATES, Judge.

This is an appeal from a judgment of the Jefferson Circuit Court holding an employee-claimant, Mr. Cecil Wood, not to be disqualified from receiving unemployment insurance because of a labor dispute in September and October, 1954, Code 1940, T. 26, § 214(A), as amended.

Our record omits the various matters required to be filed by the Director of Industrial Relations with the circuit court

under Code 1940, T. 26, § 221. However, since the circuit court cannot entertain an appeal without the appellant having shown that it exhausted its administrative remedies, we shall presume from the judgment that the jurisdictional facts have been shown because in a civil appeal the submission of the case by both parties is accorded deference, and also the record here would alternatively support consideration on a petition for a writ of certiorari. Ex parte Alabama Textile Products Corp., 242 Ala. 609, 7 So.2d 303, 141 A.L.R. 87; Alabama Power Co. v. City of Fort Payne, 237 Ala. 459, 187 So. 632, 123 A.L.R. 1337.

The testimony of Leland Johnson, Assistant General Superintendent of the ore mines and quarries of U. S. Steel, was that Mr. Cecil Wood, the claimant, worked at number seven ore mine of that company in Jefferson County, Alabama.

Mr. Wood testified that on September 29, 1954, he was working the 11:00 p. m.–7:00 a. m. turn (shift) at number seven ore mine (at Wenonah, Jefferson County, Alabama) of the Tennessee Coal and Iron Division of the United States Steel Corporation. Mr. Wood's testimony continues as follows:

"Q. Tell us just as best you recall just what happened at the end of this shift? A. I believe Mr. Henderson was night foreman at that time, and as we loaded up to come out that morning, he said that there wouldn't be any work until further notice or something to that effect.

"Q. He told you that there wouldn't be any further work? A. Yes.

"Q. I believe that you told us at the time the Board of Appeals had the hearing, you did not know or did not recall whether Mr. Henderson specifically mentioned the railroad situation or transportation situation or not; is that still your recollection of it? A. That is right; I don't know whether he did or not.

"Q. Is that all you know about why you didn't work? A. That is all.

"Q. You were ready and willing to work? A. Yes, sir.

"Q. And as soon as there was work there for you to do that the Company told you about, you were willing to work? A. Yes, sir.

"Q. And did you know anything about the problem that they say originated in the Ore Conditioning Plant that night? A. No, sir."

There were two strikes on September 29, 1954, affecting transportation of iron ore from the company's mines; *first,* to an ore conditioning plant and *thence* to the furnaces for processing ultimately into steel.

The transportation department of the company had a railroad strike which began 6:00 a. m., September 29, 1954, and ran to 11:55 a. m., September 30, 1954.

The ore plant was shut down by a dispute which began at 4:40 a. m., September 29, 1954, with a work stoppage at 7:16 a. m., of that day lasting until 3:00 p. m., October 11, 1954.

Wood was continuously out of work from 7:00 a. m., September 30 to 11:00 p. m., October 12, 1954. Since no contention is made thereabout, we take it that Wood met the burden of showing himself eligible for each week for which he has filed a claim (see Department of Industrial Relations v. Tomlinson, 251 Ala. 144, 36 So.2d 496), and that the burden of persuasion has shifted to his employer or the Director of Industrial Relations (as trustee of the Unemployment Compensation Fund) to show he is disqualified, if he is to be denied benefits because of a disqualification.

The record fails to show when Wood first reported to the Employment Service for work and filed his unemployment compensation claim. The exact date of filing is not important for present purposes. Nevertheless, his first week of compensable unem-

ployment must, under Code 1940, T. 26, § 213(D), as amended, be preceded by a week's waiting period of total unemployment.

Thus, the first week of benefits could not have been earlier than that beginning October 7, 1954—at a time when the rail strike was no longer in "active progress." So, whatever causative impulse arose from that dispute had lost all its force in the continuance of Mr. Wood's being out of work during the time for which he asks to be paid.

This dispute at the ore plant arose because the company had, after making some mechanical changes on ore crushers, graded two labor jobs from Class Three to Class Two, with a pay rate reduction from $1.68 to $1.625 per hour. The fairness of this reclassification was being considered conformably with grievance procedures under the labor-management agreement. The evidence does not reveal at what stage the matter rested on September 29.

The ore plant night shift foreman and the night shift laborers had an argument at 4:40 a. m., when the foreman ordered them to clean out a blockage caused by a failure of an "eccentric." This work apparently was considered by the workmen to be a duty within a Class Three job but not appurtenant to Class Two. The matter came to a head when the 7 a. m. shift came on and a large laboring crew were directed to start cleaning out the crusher. This they refused to do unless they were paid job Class Three. The foreman sent them home and the other men at the ore plant left in sympathy.

This ore conditioning plant served all the ore mines so that as the ore went from mine to blast furnace it had to be processed at the ore plant. However, the evidence did not demonstrate that it was an *absolute* impossibility to operate the iron ore mines without operating the ore plant. We consider that the evidence tends to show that the cessation of operations of the ore crush-

er could be a bottleneck to the operation of the mines under the physical layout of the employer's work.

This brings us then to a consideration of the dispute at the ore conditioning plant. No question is made as to its existence. The first question is: Was it in the same establishment as that in which Mr. Wood was employed? This in turn involves whether or not the principles deducible from Tennessee C. I. & R. Co. v. Martin, 33 Ala.App. 502, 36 So.2d 535, affirmed 251 Ala. 153, 36 So.2d 547, wherein the coal mines and the railroad system of this same employer (then called T. C. I.) were held to be discrete units, and, therefore, not embraced in a single establishment. Even though this first question may be resolved in favor of the employer, we then are met with the contention that, since the unemployment insurance law was enacted to better conditions in a complex industrial society given to periods of almost chronic over-production (or under-consumption) that its beneficient provisions are to be broadly construed. The analogy to the construction of an insurance policy is almost inescapable, e. g., " * * * and thereby deprive them of compensation benefits which they had bought and paid for." Department of Industrial Relations v. Drummond, 30 Ala.App. 78, at page 81, 1 So.2d 395, at page 398; see Usher v. Department of Industrial Relations, 261 Ala. 509, 75 So. 2d 165.

Whether or not this latter principle would apply even where the claimant was a participant in a labor dispute or what degree participation taints a claim under § 214 (A), we need not decide, since Wood himself was not a member of any striking union local. The fact the locals at the ore mines and those at the ore plant were constituent of the United Steelworkers does not seem relevant here to establish Wood as a striker by association.

Mr. Johnson, in explaining the relationship between the ore mines and the ore conditioning plant, stated that this part of

the company was under a general superintendent, Mr. Beck. Under Mr. Beck, we find the assistant general superintendent (the witness Johnson) and under them (1) a superintendent for ore mines nine, ten and eleven (the Ishkooda portion of the works); (2) a superintendent for ore mines seven and eight, a limestone mine and Delonah quarry; (3) a superintendent of the ore conditioning plant; and (4) a superintendent of maintenance.

We have excerpted parts of the testimony beginning with that of Mr. Johnson:

"All of the red ore [iron] that is mined at our ore mines must come to the ore conditioning plant where it is crushed first, screened and sized.

"And finally put into various stock areas, where then it is finally blended out to a certain uniform chemical content for use in the furnaces. But this ore as run-on mine [sic—run-of-mine?] ore comes out in large chunks and fines and that all must be crushed and placed into uniform sizes before the blast furnaces can use it. And also must be able to blend it to a special iron content as well as the foreign matter insofar as the product we ship to the furnaces.

"Q. Isn't it true at this time if there is some work stoppage or breakdown or any other stoppage in the ore conditioning plant, that in a matter of hours that would affect production in the mines? A. That is correct.

"Q. All right. A. The Ore Plant must unload the cars and process that ore and return the cars to the mines. If we do not have empties we cannot operate the mines."

A schematic drawing was introduced in evidence to illustrate the flow of iron ore from these mines seven, eight, nine, ten and eleven via 70-ton railroad cars all funnelling into the ore plant and thence to the furnaces for the next step in the making of steel.

Johnson used the drawing to illustrate his testimony, a copy of which is appended to this opinion:

"This sketch [defendant's Exhibit 1] depicts that we have number eleven, number ten, number nine, number eight and number seven red ore mines that are all mining red ore, and is picked up and loaded into 70 ton cars, and transported to the Ore Conditioning Plant. They all come through on one line to the plant. And this shows the so-called rotary dump where the ore then is crushed and sized there and finally blended. And it is re-loaded at this point and sent on then to the furnaces at this point where it is used in the blast furnaces. Strictly a schematic drawing, but shows the flow of the material.

"Q. But shows the flow of material to [from] the ore mines and quarries? A. That is right.

\* \* \* \* \* \*

"If we had a stoppage at this place [ore plant] where we could not unload the cars, then we would not have empties at each mine to mine ore and reload the cars. It is a continuous cycle of loading and unloading and bringing the empties back to the mines.

\* \* \* \* \* \*

"A. The production actually was stopped at the end of the three to eleven turn [shift] on September 29th; that was one hour before midnight on the 29th. That was the last of actually hoisting ore out of the mines.

"Q. All right. A. We did then operate a eleven to seven turn which went on into September 30th. But that shift is more for handling materials into the mine, such as roof bolts and our explosives and all of that; sorting material, and a small amount of service work. So we actually terminate operations insofar as the Ore Mines were concerned at 7 A.M., on September 30th.

"Q. With the actual normal production being terminated when? A. At 11 o'clock on the 29th. 11 P.M.

"Q. And I believe it was on this 11 to 7 A.M. shift that night in which Mr. Wood, the claimant in this case, last worked? A. That is correct.

"Q. When was it possible for the Ore Mines and Quarries to resume operations? A. We were able to resume operations as far as hoisting ore at 7 A.M. on October 12th. We operated both the day and afternoon turns on October 12th.

\* \* \* \* \* \*

"A. If the Ore Plant had operated and processed the ore through the primary crushers then the mines were in readiness to start as soon as there were sufficient empties to begin.

\* \* \* \* \* \*

"I will just ask you another question, Mr. Johnson. As a matter of fact, there is one portion of the ore mines and quarries which produce limestone?

"A. That is correct.

"Q. That was able to operate? A. They operated throughout this period.

"Q. From September 29th through October 11th?

\* \* \* \* \* \*

"Q. It is not necessary for limestone to go through the Ore Conditioning Plant? A. No, the limestone goes directly to the furnaces, and also dolomite quarry.

\* \* \* \* \* \*

"Q. The last shift he actually worked in this period was when? A. He completed his last eight-hour turn at 7 A.M. on the 30th.

\* \* \* \* \* \*

"Q. Do you have the date there that would show when Mr. Wood was next able to work after the work stoppage had been terminated? A. Yes, sir, I do.

"Q. If you would give us that, please, sir? A. He came out on the same 11 to 7 shift on October 12th. He came on at 11 o'clock on October 12th and worked that 11 to 7 shift, which is termed the 13th. And it so

happened he spent half of his time at Number seven and half at Number eight mines so he was timed four hours at each location.

"Q. Do you recall when it was the Ore Conditioning Plant itself actually resumed operations? A. The Ore Conditioning Plant began operations at 3 P.M. October 11th."

Johnson on cross-examination:

"Q. \* \* \* I think you testified we have a contract which covers the collective bargaining unit of the ore mines, the Conditioning Plant and the Delonah Quarry, is that correct? A. Also the Limestone mines and the old Muscoda Division.

"Q. Yes. I was treating that as ore mines. However, there are separate local unions at Delonah quarry, at the Wenonah Ore Mines and at the Sintering or Ore Conditioning Plant that we are talking about, aren't there? A. There are five locals, but they all bargain collectively.

"Q. All right. That is your opinion about it. I didn't ask you that, Mr. Johnson.

"Let me get some facts about it. You have a local union for instance in the Ore Conditioning Plant that we are talking about? A. That is right.

"Q. It has separate offices? A. Yes, sir.

"Q. Separate grievance committees? A. That is correct, sir.

"Q. It handles its grievances by itself with your lower echelons of management and then up to the superintendent of the Ore Conditioning Plant, don't they? A. That is right.

"Q. And in that regard, no one, no local union from Wenonah or Delonah or Muscoda would have anything to do with the problem that your management at the Ore Conditioning Plant

was taking up with its grievance committee, would it? A. That is correct.

"Q. And you have a superintendent, is that the title of the chief management representative in the Ore Conditioning Plant? A. That is right.

"Q. A Plant Superintendent? A. Yes.

\* \* \* \* \* \*

"Q. How far the ore conditioning plant is located from the ore mines in terms of distance? A. In terms of distance, the closest mine to the ore plant is Number Seven. And it is just a matter in a direct line of 700 feet.

"Q. What is in between; just tracks? A. That is right.

"Q. Railroad tracks? A. As [for] the handling of the ore, it would have to be switched around and the distance would be maybe a quarter of a mile or something like that. As [for] Number Eleven, it is probably two miles from the Ore Plant."

Jack Neal, superintendent of mines seven and eight, on direct:

"Q. Would you just briefly describe the first information that you had about the two work stoppages, the one that started at the Ore Mines and also the rail transportation strike and exactly what you did with respect to that? A. With respect to the one at the Ore Conditioning Plant, it was around the middle of the day as I recall on the 29th that I had knowledge of the fact that they had a crusher failure and a crusher stopped up and they were unable to get it mucked out, and that the men had left the job. And following that time, I believe it was probably sometime after six, maybe eight or nine I had knowledge of the rail transportation stoppage.

"Q. All right. A. And following that time or at the time, the 3 to 11 turn in production was in process, the decision was made that we would not be able to continue through the lack of empty railroad cars, and I went to Number Seven and instructed the night mine foreman there to advise the men that we could not operate without empties, and similarly at the Number Eight Mine."

The views of the Wisconsin and Michigan courts have now, unlike the status of the law before the Martin case, supra, become the minority doctrine as to the scope to be accorded the word "establishment" in unemployment insurance statutes; see Nordling v. Ford Motor Co., 231 Minn. 68, 42 N.W.2d 576, 28 A.L.R.2d 272 (annotation at page 287). The annotation in 28 A.L.R.2d, at page 326, et seq., lists two tests employed in ascertaining what is an establishment under similar statutes, viz., functional integrality and physical proximity. To these could be added collective bargaining units (as under various Labor Relations Acts), establishments under various phases of the Wage and Hour Law, managerial integrality. Many states have statutes that use expressions such as "factory, workshop or other premises."

It is to be noted that the Supreme Court, in T. C. I. & R. Co. v. Martin, supra, expressly refused to approve this court's finding that Martin's unemployment was directly due to a labor dispute. Therefore, the Martin case only has the imprimatur of our senior tribunal for the proposition that if the strike is not in the claimant's working establishment, as there mentioned, he is not disqualified under § 214(A).

In argument we were told by appellant that Usher v. Department of Industrial Relations, supra, was bad law. For us such a major premise for review of a record is beside the point.

Under Code 1940, T. 13, § 95, we are statutorily compelled to follow the Supreme Court: even as to its dicta, we find expressions that we are bound, Johnston v. Mobile Hotel Co., 27 Ala.App. 145, 167 So. 595; contra, McCoy v. Prince, 197 Ala. 665, 73

So. 386. For a bewildering proliferation of the problem, see Waterman S. S. Corp. v. Brill, 243 Ala. 25, 9 So.2d 23, reversing this court at 30 Ala.App. 544, 9 So.2d 21, and overruling Duggar v. Mobile & Gulf Nav. Co., 224 Ala. 359, 140 So. 614.

Thus, if we take Usher as the latest word from our senior brethren, we find the majority adopting the Drummond, 30 Ala.App. 78, 1 So.2d 395 rules:

> "*First*, a purchaser of 'protection against involuntary unemployment' should not be denied benefits because of a strike in which he is not involved and which he did not start ('the causes of which * * * he [was] powerless to avert') personally or vicariously; and

> "*Second*, the above rule did not come into play, where the employer chose to shut down claimant's establishment in fear of violence (i. e., a lockout), because a lockout to prevent bloodshed does not bring about unemployment due to a labor dispute rather it is the employer's voluntary dismissal of his workers."

Thus it would seem that anticipating the effect of a labor dispute to the extent of ordering employees not to report to work makes the cause of idleness a matter of conjecture as between the employer's willful act and the possibility of there being no work because of a stoppage of other hands. We assume the Supreme Court considers this too remote a showing of "directly due" to be a labor dispute.

We are uncertain of Mr. Justice Merrill's qualification of his concurrence in the majority opinion in the Usher case. The Drummond strike began March 31, 1939; the 1939 amendment containing the present definition of a labor dispute was introduced in the State Senate August 22, 1939 (S.B. 440, see p. 1554, 1939 Senate Journal). Thus the Drummond strike was an historical fact when the definition was put in the law. The writer attaches no significance to

this change in this case, since the 1939 amendment appears to connote what is generally accepted in common terms as a labor dispute between those in privity as employer and employee.

In view of the breadth of the Drummond case rules, as finally assimilated into our received law by the Usher opinion, we consider the Martin establishment enquiry as unneedful.

The judgment of the Circuit Court is

Affirmed.

### On Rehearing.

Appellant's brief on application for rehearing states:

> "* * * The Court's analogy to the construction of an insurance policy, as based on the Drummond and Usher decision, is misleading and unsound. Sums payable to beneficiaries of an insurance policy are paid wholly from funds accumulated from premiums paid solely by the policy holders 'who bought the protection'. This is not true in respect to funds from which unemployment compensation benefits are paid. The greater portion of such funds does not accumulate from the fractional contribution by employees but from taxes levied against the employer. From the way the phrase 'purchased his protection against involuntary unemployment' has been hailed and bandied about since the Drummond pronouncement, the impression *as* been foisted upon the interested public, and swallowed by employees themselves, that the contributions of employees to the Unemployment Compensation Fund from which benefits are paid constituted the *entire*, and *sole* source of these funds. The analogy of protection provided by an insurance policy has been invoked. This Court judicially knows that such is not the case. From the terms of the statute the Court knows that never, under any circumstances, do the con-

tributions of employees to the Unemployment Compensation Fund consist of more than a small part of the total. The remainder is paid by employers.

"Since it is a fact, stated plainly in the law, that the sums contributed by employees to the Unemployment Compensation Fund from which benefits are to be paid constitute but a small fraction of the total of that fund, and the remainder is taxable to employers, appellant sincerely feels that in all fairness and justice, this fact should be noted in the opinion so as to accurately portray the whole truth as to who pays for the 'protection against involuntary unemployment'. The language of Drummond, whether so intended or not, would lead a reader to believe that the employees alone provide the funds. Of course, this Court knows this is not true."

The greater portion of the unemployment compensation tax is paid by the employer rather than by the employee, e. g., pursuant to the rate schedule in effect under § 204(F) of the law before January 1, 1958, the ratios run 27 to 10, 25 to 9, 22½ to 4, 10 to 3, 7½ to 2, and 5 to 1.

Whether or not, if there were no tax, the amount now paid on wages by the employer would otherwise be added to the worker's take home pay, as has been argued by some writers, we need not decide— although Ricardo's Wages Fund Theory and the Bargaining Theory of Wages afford respectable, though not conclusive, authority that all social insurance deductions are paid by the worker, even though the legal incidence may fall in whole or in part on the employer. For us, in trying to follow the Drummond and Usher cases, the fact that Alabama collects a tax levied directly on earnings gives an outward aspect of an interest of a pecuniary nature in the protection available under the unemployment compensation fund. The employer, too, has, at least, a statutory interest in benefit cases—compare Ford Motor Co. v. Unemployment Compensation Comm., 191 Va. 812, 63 S.E.2d 28.

The appellant has asked us to point out that the following facts appear in the record:

"That the claimant was a member of United Steelworkers of America, CIO; that the production and maintenance employees of employer's Ore Mines & Quarries Division (including the employees at the ore conditioning plant and the claimant and other employees at Ore Mine No. 7) were represented by United Steelworkers of America, CIO, as the exclusive bargaining agent; that such production and maintenance employees were covered by one collective bargaining agreement negotiated by the same bargaining representatives and executed in the name of and on behalf of the same Union, namely, the United Steelworkers of America, CIO; and that the strike causing the unemployment of claimant was actually terminated as a result of telegraphic orders or instructions from the Chief Executive Officer of United Steelworkers of America, CIO."

We adhere to our original view that Wood's membership in a different local does not place on him any derivative responsibility for the action of the local at the ore plant since the record fails to show any control by Wood's local over the ore plant local.

It has been suggested that the motive of the 1939 amendment of what is now § 214A was to penalize the fellow employees of those who strike—to use the double pressure of unemployment and the denial of unemployment benefits working upon nonstrikers to induce them to in turn put pressure on the strikers to return to work.

The minority opinion in the Usher case, supra [261 Ala. 509, 75 So.2d 178] states in part:

"In the Drummond case, supra, principal reliance seems to have been placed on the case of Kieckhefer Container Co. v. Unemployment Compensation Commission, 1940, 125 N.J.L. 52, 13 A.2d ,646. To show that that decision can be of no weight here, we need only to call attention to a very material distinction between the New Jersey law and the Alabama law. The New Jersey law, R.S.1937, 43:21-5(d), N.J.S.A., expressly provides that a claimant is not disqualified if it is shown that he is not 'directly interested in the labor dispute' causing the stoppage of work. There is no such provision in the Alabama law, although it may be said that the general disqualification clause in the New Jersey and Alabama laws are of similar import; but the similarity stops there. The Alabama law contains *no* exception to the general disqualification provision.

"It may be stated that the Alabama statute is perhaps as restrictive as any other law on the subject and more restrictive than most of the laws on the subject. In this connection attention is directed to several pertinent annotations and law review articles: 28 A.L.R.2d 287; 173 A.L.R. 490; 154 A.L.R. 672; 148 A.L.R. 1309; 135 A.L.R. 920; Unemployment Comp. Comm. v. Aragan, 329 U.S. 143, 67 S.Ct. 245, 91 L.Ed. 143; Frick, Unemployment Compensation—Effect of the Merits of a Labor Dispute on the Right to Benefits, 49 Mich.L.R. 886-896 (1951); Eligibility for Unemployment Benefits of Persons Involuntarily Unemployed Because of Labor Disputes, 49 Columbia L.R. 550-566 (1949); 33 Minn.L.R. 758-770 (1949); Lesser, Labor Disputes and Unemployment Compensation, 55 Yale L.J. 167-181 (1945-46); Fierst and Spector, Unemployment Compensation in Labor Disputes, 49 Yale L.J. 461-491 (1939-40).

\*   \*   \*   \*   \*   \*

"To repeat: The Alabama law as now written prohibits the payment of benefits when one's unemployment is 'directly due to a labor dispute still in active progress in the establishment in which he is or was last employed'. If that clearly expressed State policy is to be changed so as to permit benefits to one who has not participated in any way in the 'labor dispute' causing his unemployment, it should be done by legislative action as has been done by our bordering sister states and most of the other states."

There is nothing in this record to show that Wood was "interested" in the outcome of the ore plant strike.

A trade union—in this instance more properly an industrial union—is ordinarily organized as a voluntary association. Under Code 1940, T. 7, § 142 et seq., the common name is dignified as an entity for the purpose of suit. Whether or not § 145 is a limitation of liability, we need not enquire.

■ Voluntary associations occupy dualistic status, i. e., they may "legislate" and adjudicate internally and externally have their decisions and actions involving property rights enforced in the public courts—save only where some provision of law or public policy is in conflict.

"\* \* \* These institutions, operating for their members or a reasonable classification thereof for reasons of policy and that of its welfare, may adopt laws for their government, to be administered by themselves to its members, and require for the general benefit the surrender of no right that an individual may not waive. And he is bound by that authority and law only so long as he chooses to recognize that authority, Woodman of the World v. Alford, 206 Ala. 18, 89 So. 528; Ex parte Mosaic Templars of America, 212 Ala. 471, 103 So. 65. \* \* \*" Brotherhood of Railroad Trainmen v. Barnhill, 214 Ala. 565, 108 So. 456, 462, 47 A.L.R. 270.

■ The mode of procedure of ascertaining the associative will as to a given matter we consider to be regulated by the constitution and by-laws and any motion or resolution duly adopted thereunder in accord with the usual tenets of parliamentary law, 7 C.J.S. Associations §§ 11 and 18.

■ In general, as we understand the principles of federated unionism organization, the top organization, while composed of national and international unions, has the power to charter additional such unions in different crafts and industries, and also the power to revoke the charter of any of its constituent national and international unions. The national and international unions in turn charter local unions and have authority to revoke such charters. A member of a local is also ipso facto a member of the parent union. See charts of AFL and CIO, Rothenburg, Labor Relations, pp. 21 and 22.

This compound membership can lead to dual liability. Thus, in United Mine Workers of America v. Patton, 4 Cir., 211 F.2d 742, 746, 47 A.L.R. 824, we find:

"The chief argument of defendants in support of their motion for directed verdict is that there is no evidence that they authorized or ratified the strikes upon which plaintiffs rely for recovery. It is true that there is no evidence of any resolution of either the United Mine Workers or District 28 authorizing or ratifying the strikes. There is evidence, however, that the strikes were called by the Field Representative of the United Mine Workers, who was employed by District 28, and that he was engaged in the organization work that was being carried on by the international union through District 28, which was a mere division of the international union. Members of the union are members of local and district unions as well as the international; and of the $4 monthly dues paid by them, $2 goes to the international union, $1 to the local union and $1 to the district organ-

ization. It is clear that in carrying on organizational work the field representative is engaged in the business of both the international union and the district and that both are responsible for acts done by him within the scope and course of his employment. Stockwell v. United States, 13 Wall. 531, 545–548, 20 L.Ed. 491; Hindman v. First Nat. Bk. of Louisville, 6 Cir., 112 F. 931, 57 L.R.A. 108; Oman v. United States, 10 Cir., 179 F.2d 738; United States v. Waters, 7 Cir., 194 F.2d 866; Jefferson Standard Life Ins. Co. v. Hedrick, 181 Va. 824, 27 S.E.2d 198; 2 Am.Jur. 279; A. L. I. Restatement of Agency, sec. 212. The relationship between the international union and the district organization was pointed out by the Supreme Court of Appeals of Virginia in United Const. Workers v. Laburnum Const. Corp., 194 Va. 872, 75 S.E.2d 694, 703–704, where the court said:

" 'United Mine Workers of America is a labor organization with approximately 650,000 members who are primarily engaged in mining and processing coal at the mines. District 50 United Mine Workers of America has a membership of 112,000, which is largely made up of workers who convert coal into chemical constituents, such as dyes, drugs, plastics, etc. A part of its charter fees, initiation fees and dues is paid to the United Mine Workers of America. According to defendants' brief, "Its members are part of UMWA, but retain their identity, membership rights and privileges at all times as members of District 50." In other words, District 50 is an arm or branch of the United Mine Workers of America.

* * * * * *

" 'Thus, while the defendants' brief insists that "members of District 50, UCW and UMWA are not members of one organization," a fair deduction from the record is that District 50 is a component part of United Mine Work-

·ers of America, *or at least its agent* in organizing workers in businesses other than that of mining coal.' (Italics supplied.)"

We take it that appellant would have us impose this principle to deny Wood benefits: that there is here an exception to the Drummond rules, since Wood, it is argued, brought about his own unemployment be·cause of his participation in the contractual nexus, the United Steel Workers of Ameri·ca.

The pertinent part of the Drummond ·opinion [30 Ala.App. 78, 1 So.2d 398] reads:

" * * * the Legislature never intended that one, who has purchased his protection against *involuntary* unemployment, should be denied those benefits because of a 'labor dispute' in which he was in no way involved and the causes of which unemployment he, his agents or organization were powerless to avert. * * *" (Italics ours.)

At the outset, we are confronted with "involuntary" unemployment which we take ·as a generality referring to idleness without volition on the part of the claimant. Has the claimant by his voluntary association in the United Steel Workers given his proxy so that the strike of another local is in legal ·contemplation of the strike of all constituents of the parent union? The tendency of Walker v. Medical Soc. of Mobile County, 247 Ala. 169, 22 So.2d 715, 721, would seem ·to point to the permissibility of the parent ·organization being predominant:

"The proposition, that the parent ·organization by its constitutional man·dates may legally assume such exclusive ·supervisory jurisdiction over the subordinate Society, has been set at rest by our own court. Such Association, operating by and through the members and for their welfare, may adopt laws for their government and to administer their several rights, powers and benefits, and to this ·end may invest the parent Association with such exclusive

prerogatives as here appearing and, in the absence of fraud, the decisions of the parent organization made pursuant therewith are binding upon the members as well as the local Societies. Brotherhood of Railroad Trainmen v. Barnhill, supra."

Have we evidence that this power has been brought into existence? The appellant in its original brief summarizes the testimony of Mr. R. E. Strain as follows:

"I am Director of Labor Relations for the entire Tennessee Coal & Iron Division of the United States Steel Corporation. I am familiar with the terms of the agreement between the Company and the United Steelworkers of America dated July 1, 1954,' which has been introduced in evidence.

"The employees in the ore mines and quarries division that are covered by the agreement include all production and maintenance employees of the ore mines and quarries. That takes in all divisions, Ishkooda, Wenonah, Muscoda, Delonah and the ore conditioning plant. They are all in the same bargaining unit. They are all represented by the same Union as exclusive bargaining agent under the National Labor Relations Board. This contract contains, under Section 4, the responsibility of the parties and the no-strike provisions there on Page 5.

"The first information I had about this work stoppage at the ore conditioning plant on September 29, 1954 was that about 8 or shortly thereafter. The steps which I took with respect to the work stoppage followed the usual procedure when I learned of the work stoppage. I contacted the District Union representative who represents the employees of the particular group. In this case I contacted Mr. George Elliott who is the District representative representing the ore conditioning plant employees as well as the other ore mines and the Delonah Quarry. ·Mr. Elliott is the man or agent repre-

sentative whom I would normally contact in case of any dispute or work stoppage.

"He was not in when I made my first call which was shortly after 8 o'clock but I did talk to him about 9:15 and explained to him the difficulties that were being encountered at the ore conditioning plant. He told me at that time that he had already heard about the stoppage and he was making some effort to contact the President of the local Union who was Mr. Marchand.

"That was about 9:15, I would assume. He told me that he would contact Mr. Marchand and that he would call me back. He did call me back about 11 A.M. and stated that he believed the boys were going back to work that afternoon at 3 o'clock. However, inasmuch as we were having trouble with not paying Job Class 3 that we might have similar trouble at 3 o'clock that afternoon.

"I had further conversation with Mr. Elliott pertaining to this matter the same day. The men did not report at 3 o'clock but at about 4:15 that afternoon Mr. Elliott called me and told me that they did not go back to work. He stated that he had been meeting with them for over an hour or more and that they were going back to work and wanted to know what time they should report. He wanted to know should they go there immediately or should they wait until 11 P.M. which was the next regularly scheduled time.

"I contacted Mr. Gene Reid who is the manager of the Raw Materials Division. He, in turn, contacted Mr. Beck to determine when the employees should report and at about 5 o'clock I told Mr. Elliott the employees would be expected at 11 o'clock that night. That was the last conversation I had with them that day. I did not know whether they did or did not report at 11 o'clock that night.

"I don't recall any specific conversation I had with Mr. Elliott during the work stoppage from September 29th to October 11th but we talked daily and I am sure we did discuss it. I say daily, but almost daily. The work stoppage was ended at 3 o'clock P.M. October 11th at the ore conditioning plant.

"There was a rumor afloat about 8:30 that morning that there would be a meeting at the ore conditioning plant local. Mr. Paul Bowron, who is the Assistant Manager of Industrial Relations for the Company, contacted Mr. R. E. Farr, who is the District Director of the United Steelworkers in this area and asked him if that was true and Mr. Farr stated that he and Mr. Marchand both had received telegrams from Mr. David McDonald, who is the President of the United Steelworkers, to go back to work and that there would be a meeting at approximately 10:00 o'clock or 10:30 o'clock and that he would call Mr. Bowron later and let him know what they decided to do. Mr. Bowron told me Mr. Farr called him at approximately 11:30 and said the fellows would be back at 3 o'clock that afternoon.

"On cross-examination, the witness continued:

"I know that this Mr. Elliott, that I have referred to, serves locals for the District Office. For instance, at Woodward Iron Company. He serves lots of folks."

While this power over a local exists its exercise seems to be looked upon askance, particularly when the existence of the local as an entity is threatened or called into question. In Francis v. Scott, 260 Ala. 595, 72 So.2d 98, 101, we find:

"One feature of the bill is to enjoin the international union from requiring complainants to join the local union at Sheffield (No. 682) in order to preserve their financial rights and security which they had as members of local No. 388. That is in the nature of a continuing act and subject to prohibitory injunction. There is also equity in the bill to the extent that it seeks declaration of rights as to which there is a justiciable controversy. The rules and regulations made, by which such an association is governed, constitute a contract between its members, Medical Society v. Walker, [245 Ala. 135, 16 So.2d 321] supra, and therefore subject to construction by the court in a declaratory judgment under section 157, Title 7, Code, when there is an actual controversy with respect to it.

"We think the court was justified in finding that the international union undertook to cancel membership in it by the Florence local No. 388 and its members on account of their refusal to change their prices and hours to conform with local No. 682 at Sheffield; that the constitution of the association extended the privilege to each local to fix its own prices and hours. That this was a binding and important feature of it. Therefore the court properly held that complainants had a right to have a declaration made by the court that the order of the international, which amounted to a dismissal of them from the association, was void because it violated their contract as expressed in the constitution. It follows that the international had no right to remove the charter, shop cards and individual membership cards, and should restore them to the Florence local No. 388, and its membership in the international union. * * *"

31 Am.Jur., Labor, § 42, reads:

"Although a local union is generally regarded as subordinate to its national union, it does not owe its existence to the association of unions with which it is affiliated, but is a separate and distinct voluntary association owing its creation and continued existence to the will of its own members. The relationship between a national union and its subordinate local unions is determined by the constitution, charter, and bylaws, which constitute a contract between the national and local organizations and the members of the local union."

We do not think that the circumstance of Wood's local being in the same national as the striking ore workers' local is evidence of ratification of or participation in the strike. So we find Parker, C. J., in United Construction Workers v. Haislip Baking Co., 4 Cir., 223 F.2d 872, 877, writing:

"* * * What we are dealing with is, not a case where circumstantial evidence points to instigation of a strike by defendants or the agents who represented them, but a 'wild cat' strike of local origin, without anything to suggest that defendants or their agents had anything to do with bringing it about. Morris and Belcher were called in to try to end the strike and get the men to go back to work, and everything that they did was directed to that end. Even if the testimony as to their advising the men to go back to work be disregarded and it be assumed that they did nothing of the sort, there is no evidence to support the view that they adopted the strike, that they encouraged it or that they prolonged it.

"The real question in the case is whether the defendants, because of entering into collective bargaining agreements with plaintiff requiring that grievances be settled pursuant to the procedure provided by the contract, are liable for damages caused by a 'wild cat' strike entered upon on account of such grievances by local employees, but without the authorization

or sanction of the defendants. We think that this question must be answered in the negative. The local union was liable because the strike, although informally commenced, unquestionably had the approval of the local union; but this was not true of the defendants.

"There is nothing in the contract making defendants liable for 'wild cat' strikes or requiring that they take any action with regard to them. This court has pointed out that employees who engage in 'wild cat' strikes lose the protection of the Fair Labor Standards Act and may be discharged by their employers with impunity for so doing. N. L. R. B. v. Draper Corporation, 4 Cir., 145 F.2d 199, 156 A.L.R. 989. We have never held, however, that there is any responsibility on the part of a union for a strike with which it has had nothing to do; and there manifestly is no such liability. If Morris and Belcher had done nothing when plaintiff called on them to help get the men back to work, there would have been no liability on the part of the defendants. This being true defendants were not rendered liable by the efforts which these men made to bring about an adjustment of the difficulty, even if they did not do everything that they might have done to that end. The question is not whether they did everything they might have done, but whether they adopted, encouraged or prolonged the continuance of the strike. There is no evidence of any sort that they did.

"We think, also, that there is no showing of either express or implied authority on the part of either Morris or Belcher to adopt on the part of defendants a 'wild cat' strike of this character. It must be borne in mind that the strike did not arise out of organizational or other activities in which defendants had an interest and in which their representatives might be held to have implied authority to participate in protection of that interest. Cf. United Mine Workers of America v. Patton, 4 Cir., 211 F.2d 742. It arose out of a grievance having no relation to organization or the interests of the defendants. It is hardly conceivable that authority to adopt, to participate in or to encourage such strikes, which are clearly inimical to the interests of a union, should be vested in field officers or regional directors. We find nothing in the record to justify a finding that either Morris or Belcher had such authority."

The record before us contains only the collective bargaining agreement alluded to above and the testimony along the lines quoted above in bringing out the connection of the National union with the striking local and Wood's local. We consider there is no evidence in the record from which a court could be reasonably satisfied that the dispute was attributable to either Wood's local or to the National. The situation was much like that in the Haislip case, supra.

In view of the highly developed form of association here and of the "entity" theory set forth in T. 7, § 142, it would seem that the required evidence would have to rise at least to the level of that required by the Alabama Supreme Court's doctrine of proof of "corporate participation" under the cases such as City Delivery Co. v. Henry, 139 Ala. 161, 34 So. 389, and Louisville & N. R. Co. v. Johns, Ala., 101 So.2d 265.* Whether the ratification or other adoption of an intentionally wrongful act by a member or agent of an association could be restrained as ultra vires the society would seem to be a matter of internal concern, and certainly one having no decisive bearing on this consideration.

Application overruled.

* 267 Ala. 261.

### After Remandment

Mr. Wood's counsel moved us to consider the meaning (in Code 1940, T. 26, § 214 (A)) of "establishment." On June 12, 1959, we heard this point reargued at our request because Mr. Wood's belonging to the same parent union as the ore conditioning plant workers would not disqualify him if he worked in a different establishment. Tennessee Coal, Iron & R. Co. v. Martin, 251 Ala. 153, 36 So.2d 547.

Most states provide a worker may purge himself of disqualification for unemployment insurance in a labor dispute if he stands indifferent by not participating, financing, being interested in the event, nor belonging to a grade or class so doing. However, Alabama, California, Delaware, Kentucky, Minnesota, New York, Ohio and Wisconsin do not so provide. Williams, The Labor Dispute Disqualification, 8 Vand. L.Rev. 338, at 353, n. 63; Haggart, Unemployment Compensation During Labor Disputes, 37 Nebr.L.Rev. 668, see Appendix Tables at 696.

Of these eight only Alabama, California, Kentucky, Minnesota, New York and Wisconsin describe the place of work as an "establishment," instead of using the more common "factory, establishment, or other premises."[1] If we concede more force of persuasion to the opinions from these "establishment" states, we find conflicts.

California: Matson Terminals v. California Employment Commission, 24 Cal.2d 695, 151 P.2d 202 (meaning affected by place of work in contract of employment).

Kentucky: Ford Motor Co. v. Kentucky Unemployment Compensation Commission, Ky., 243 S.W.2d 657 (see Nordling case infra); Snook v. International Harvester Co., Ky., 276 S.W.2d 658.

Minnesota: Nordling v. Ford Motor Co. [231 Minn. 68, 42 N.W.2d 576, 28 A.L.R.2d 272], supra.

New York: Machcinski v. Ford Motor Co., 277 App.Div. 634, 102 N.Y.S.2d 208; In Claim of Lasher, 279 App.Div. 505, 111 N.Y.S.2d 356.

Wisconsin: Spielmann v. Industrial Commission, 236 Wis. 240, 295 N.W. 1.

In the 1949 Ford strike, all courts except Georgia[2] held the company's organization too far flung to be a single establishment. But at least two of the "establishment" states which had Ford cases, Kentucky and New York, have each since denied benefits where divisions of other concerns were treated as one establishment. Snook v. International Harvester Co., supra, and In Claim of Lasher, supra.

Mr. Wood was working at number seven ore mine; the labor dispute arose at the plant some 700 feet away, with only railroad tracks between. Special 70-ton railroad cars haul the ore from the Red Mountain mines to the ore conditioning plant. This plant's main tasks are blending, crushing and sintering the iron ore. The need for the plant in preparing the ore for the blast furnaces was not disputed.

The record does not show whether the ore plant's location is one dictated by economic factors such as the extra capital cost, if any, of the 70-ton special cars over the capital cost of the cars used to haul blended ore to the blast furnaces. Nor is there any evidence that crushing, blending and sintering cost less when done at the ore mines.

Concededly, here the ore miners follow crafts and trades mainly differing from those of the ore plant workers. In the Martin case, the coal miners' work differed from that of railroad workers. Other points of similarity between the ore mines and the coal mines might be made, but their materiality seems doubtful.

1. Michigan which uses "establishment" now excuses those not "directly involved." Park v. Appeal Board, 355 Mich. 103, 94 N.W.2d 407, at page 421. Cf. Adamski v. State of Ohio, Bureau of Unemployment Compensation, 108 Ohio App. 198, 161 N.E.2d 907.

2. Ford Motor Co. v. Abercrombie, 207 Ga. 464, 62 S.E.2d 209. For a complete list, see Park v. Appeal Board, supra.

On original deliverance, we gave the testimony of Mr. Johnson, part of which went:

"* * * this part of the company was under a general superintendent, Mr. Beck. Under Mr. Beck, we find the assistant general superintendent (the witness Johnson) and under them (1) a superintendent for ore mines nine, ten and eleven (the Ishkooda portion of the works); (2) a superintendent for ore mines seven and eight, a limestone mine and Delonah quarry; (3) a superintendent of the ore conditioning plant; and (4) a superintendent of maintenance."

In the Martin case the coal mines (as compared with the railroad) were a separate operating division and collective bargaining unit. In the Martin case the contrast between a railroad and coal mine was sharp enough to distinguish one from the other as a separate place of business. But no such sharpness of cleavage stands out between an ore mine and an ore plant.

Recapitulating the factors courts have usually treated as relevant, we find:

| Factors | Martin's case | Wood's case |
| --- | --- | --- |
| 1. Functional integrality. | Not found in assembly line sense. | More closely knit than in Martin. |
| 2. Physical proximity. | No bearing (railroad tracks went to coal mines). | 700' apart but linked. |
| 3. Collective bargaining units. | Separate. | Same (joint contract with 5 locals, District 36 and National). |
| 4. Wage and hour law. | Not applicable. | Not applicable. |
| 5. Managerial integrality. | No. | Yes. |
| 6. Personnel Practices. (a) Place of work under contract of employment. | (a) Presumably separate as to craft and assigned place of work. | (a) Presumably separate as to craft and assigned place of work. |
| (b) Seniority rules, classification, lines of promotion. | (b) Separate. | (b) Separate. |
| 7. Economic factors. | No evidence. | No evidence. |

■ Factors 3 and 5 make the instant case one of greater coordination in production units than existed in Martin. Factor 1 also tends the same way; 2 and 6 had little or no weight in the Martin case and have none here. We think the evidence here marks the place of Wood's work and the locus of the strike as parts of the same establishment.

In this case 114 So.2d 552 our Supreme Court has said:

"We think the restrictive provisions of Subdiv. A, § 214, Tit. 26, as amended, supra (for a discussion of this statute see Usher, supra, including the minority opinion), denote a clear legislative purpose and intent; and that such purpose and intent should not be extended beyond the holding in Usher. To hold that claimant is entitled to unemployment benefits in this case would be to extend that holding. We find

no warrant to do so by judicial interpretation."

We, too, consider Martin marks a line beyond which we would venture into lawmaking, especially in view of the power reserved under Code 1940, T. 26, § 250. The evidence that number seven mine and the ore plant belong to the same establishment outweights that to the contrary.

The judgment[3] in the circuit court is reversed and this cause is there remanded for proceedings consistent herewith.

Reversed and Remanded.

3. The cause should be styled against the Director of Industrial Relations. Code 1940, T. 26, § 220, sentence 2 provides:

"* * * The director shall be deemed to be a party * * * to any judicial action involving any such decision."