178 So.2d 185

**STATE DEPARTMENT OF INDUSTRIAL RELATIONS et al.**

**v.**

**A. H. FORD.**

**7 Div. 762.**

Court of Appeals of Alabama.

Feb. 16, 1965.

Rehearing Denied March 23, 1965.

**682**

J. Eugene Foster and Chas. P. Miller, Montgomery, for appellant Department of Industrial Relations.

Inzer, Martin, Suttle & Inzer, Gadsden, for Republic Steel Corp.

Hawkins & Rhea, Gadsden, for appellee.

JOHNSON, Judge.

The appellee, A. H. Ford, an employee of Republic Steel Corporation, filed claims for unemployment compensation benefits for periods of partial unemployment occurring during the course of a strike against Republic Steel in 1959 by the United Steel Workers of America. The Board of Appeals of the State Department of Industrial Relations held that Ford was not entitled to benefits, and Ford appealed that decision to the Circuit Court of Etowah County, Alabama. Republic Steel was made a party defendant by agreement.

Twelve other employees of Republic Steel also appealed decisions of the Board of Appeals and since the basic facts in these cases were similar to the facts in the Ford case, the Ford case was tried by agreement.

The trial court found that Ford was entitled to unemployment compensation benefits in the amount of $236.00, and entered a judgment for Ford in that amount. The State Department of Industrial Relations and Republic Steel have appealed to this court from that judgment.

The question raised in the court below was whether Ford is disqualified under Sec. 214, Subdiv. A, Tit. 26, Code 1940, which provides:

"§ 214. Disqualification for benefits. —An individual shall be disqualified for benefits for total or partial unemployment:

"A. For any week in which his total or partial unemployment is directly due to a labor dispute still in active

progress in the establishment in which he is or was last employed; for the purposes of this section only, the term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee. This definition shall not relate to a dispute between an individual worker and his employer."

Ford was a railroad conductor in the Transportation Department of the Company (Republic Steel) before, during and after the 1959 strike by the United Steel Workers, and was at all times a member of Local Union 2176 of the United Steel Workers.

The strike was nationwide in scope and extended from July 15, 1959, to November 7, 1959. A picket line was maintained around the Company's property during the entire strike.

Prior to the strike, Company and Union officials agreed that the Company's By-Product Plant "would be continued in operation on a limited basis during the strike, and that the Union would allow the necessary employees to enter the plant for that purpose." The By-Products Plant, which is one of several operations conducted at the Company's plant, consists of a battery of coke ovens in which coal is converted into coke, a necessary item in the manufacture of iron. The coke is used in other operations of the plant, such as the blast furnace and open hearth. If the coke ovens are not fired and used periodically they will cool and the brickwork on the inside of the oven is likely to contract and fall in. It is important to the Company and its employees to keep these ovens fired-up during a strike so as to avoid costly and time-consuming repairs that might postpone the resumption of normal operations of the plant upon the termination of the strike.

In addition to employees who normally operate the coke ovens, the Company and Union agreed that certain employees in the Transportation Department would work during the strike in order to expedite the limited operation of the coke ovens. Ford was one of the employees who was permitted to work during the strike. All of the employees who worked during the strike received two passes—one from the Company and one from the Union—which were used to get through the picket line and into the plant.

Actual production of coke was accomplished during the strike, which was stockpiled and used in the normal operation of the plant upon the termination of the strike. The coke ovens could not have been properly operated without the assistance of the Transportation Department employees, who operated the train and cranes used to get coal to the ovens and carry coke away from the ovens and place it in stockpile. The work performed by employees in the Transportation Department during the strike was the same as performed during normal operations of the plant, except that coke was carried to stockpile instead of to other departments for use.

Company officials in the Transportation Department had a roster of employees in that department who were permitted to work during the strike, and these employees were called in to work shift assignments on the basis of seniority. Men at the top of the seniority list were called in to work the first shift, and men next in seniority were called to work the next shift, and so on down the list. Ford was the fourth man on the seniority list and there were at least twenty men on the list with less seniority than Ford.

The Company operated only one train during the strike and only two or three cranes. The crew on the train consisted of an engineer, two switchmen, and a conductor. Inasmuch as employees were called to work on the basis of seniority, Ford worked only eight hours in each two-week period from the week ending August 1,

1959, through the week ending November 7, 1959, with the exception of the week ending September 12, 1959, during which week he worked sixteen hours. His earnings were such that he is entitled to unemployment compensation benefits unless disqualified under Sec. 214(A), supra.

 Ford contends that the Company excluded him from the "labor dispute" by arranging with his Union for him to continue working during the strike, and that his unemployment was due to an independent act of the Company and not "directly due" to the strike. He further contends that the Company, after arranging to exclude certain employees from the "labor dispute", determined the amount of work and number of employees it would use, and called the employees in to work on the basis of seniority at its own discretion. We are of the opinion that the evidence does not support these contentions.

Ford testified that he went to the picket line from time to time during the strike for the purpose of identifying employees who had passes, so as to avoid the possibility of objections from the Company or the Union. During direct examination of Ford the following testimony was given:

"Q. So far as you know, were all of these men, during this entire period of time, ready, willing, able, and available for work, and were you ready, willing and able and available for work?

"A. Yes, sir. Actually, they—they would call some time when we wouldn't be expecting it, because somebody maybe didn't get there, and they would need a additional crew, you know, for something, why, they would call us."

On cross-examination, Ford testified as follows:

"Q. Did you go out on strike when it was called?

"A. Well—I'll put it this way. The next day, I think it was the next,

or the next one, I worked. I went out. In other words, everybody went out, except the ones that they agreed to work—

\*　　\*　　\*　　\*　　\*　　\*

"Q. All right. Who notified you to report to work?

"A. The Company would give the list to our Committeeman, and he would tell us where to go and—

"Q. Who notified you, Mr. Ford, to report to work?

"A. Tom Clontz, the General Yard Master, is the one who told me when to come in.

"Q. The Assistant Yard Master?

"A. No, he's General Yard Master.

"Q. General Yard Master. Did the Union give you instructions to report to work also?

"A. I had a pass to get in, yeah.,

"Q. Who issued you that pass?

"A. I had one from the Company and one from the Union.

"Q. I see. And you went to work, either the first or the second day following the strike?

"A. I—I'm fourth in seniority, and it was one of them days.

"Q. I see. And the people were called back to do this work, accordingly to their seniority, is that correct?

"A. Yeah, rotated around."

On redirect, Ford testified that, as far as he knew, all of the employees who were allowed to work came in when requested by the Company, and then on recross-examination he testified:

"Q. Isn't it—one more question—is it not a fact, though, that you—the—you said they came in when requested by the Company. Is it not a fact though, that this request

was made to the Union, and the Union determined under what circumstances they would be allowed to come in and who would be allowed to come in?

"A. No. Un-uh.

"Q. In other words, on that first day, you could have gone in without the Union's O.K., ahead of the fellow who had seniority on the job?

"A. No. No. Beg your pardon. We had a pass in. And in a strike, which Mr. Powell and them had a pass also. That's the Union—I mean the Company officials, they had a pass. And I was called, at home by supervision, when somebody failed to show to come in and work, two or three times during—over the period of the 116 day strike. And I was never directed right from the Union to go in, because it was set up, as I said, on the seniority basis, and we knew when we was supposed to work."

No evidence of a written agreement between the Company and the Union was introduced.

Preston B. Powell, the Company's Superintendent of Industrial Relations for the Southern District, represented the Company in negotiations with the Union leading to the agreement whereby the coke ovens were allowed to be operated on a reduced scale by union employees. Mr. Powell testified that he considered the work performed during the strike to be maintenance or service work and not production work. He further testified, in part:

"Q.. Mr. Powell, who made the decision as to what particular maintenance employees would be called. in to do this maintenance work?

"A. I believe that was by agreement with the respective department head. As has been previously stated, the Transportation Department had their roster, and they called the senior men in for the first trick, let us say, and the next senior men for the next trick, when they were required.

"Q. Was it necessary to clear that through the Union, or what was the arrangement with reference to certain number of employees?

"A. In the Transportation Department that was handled with the Zone Representative. In the Electrical and Mechanical Department, generally, that came through my office, and we in turn contacted the Union and told them who we wanted or the number of people we wanted.

"Q. Did you tell them who you wanted, or the number of people you wanted?

"A. Well, we did both.

"Q. Well, were you—were you able to select particular individuals that you might want when you needed a certain number of persons?

"A. That was done on the basis of seniority, in the Electrical and Mechanical Department itself.

"Q. Well, when you called for a certain number of maintenance employees, and the persons that you—that answered that call would depend upon their seniority status?

"A. That's right.

"Q. And you had to contact the Union, who—did they determine who had the seniority, or did you all discuss it and come to a common agreement, or how was that handled?

"A. Well, there is very little question about that, in most cases. There

may have been one or two instances where the question of whether or not a man was permitted to come in, but I couldn't recall a specific instance.

"Q. To your knowledge did you ever call any employee to come in—I am talking about an employee who was a member of the Union—to come in to do work without clearing it through the Union?"

"A. Well, I will put it this way. We have called the Union and said we needed somebody, and they not be able to get in touch with them, and we would in turn get in touch with them."

Goodwyn, J., in United States Steel Corporation v. Wood, 269 Ala. 5, 114 So.2d 551, wrote:

"In Usher v. Department of Industrial Relations, 261 Ala. 509, 75 So.2d 165, a majority of the court (in a four to three decision) approved the following language of the Court of Appeals, in Department of Industrial Relations v. Drummond, 30 Ala.App. 78, 1 So.2d 395, 398, certiorari denied 241 Ala. 142, 1 So.2d 402, to wit:

" 'The conclusion is inescapable that the Legislature never intended that one, who has purchased his protection against involuntary unemployment, should be denied those benefits because of a "labor dispute" in which he was in no way involved and the causes of which unemployment he, his agents or organization were powerless to avert.'

"In Usher the claimant was a member of the Brotherhood of Locomotive Firemen and Enginemen which was not on strike nor engaged in a labor dispute. The striking union in that case was the United Steelworkers union, a member of C. I. O., with which claimant had no affiliation whatever; nor did claimant's union have any

affiliation whatever with said striking union. Claimant's unemployment was found to be directly due to the steelworkers' strike.

"In the case now before us the claimant was a member of a local union affiliated with the national union of United Steelworkers of America, C. I. O., with which national union the striking local union was also affiliated. For the purposes of this review, there appears to be no dispute that claimant's unemployment was directly due to the strike of said affiliated local.

"As we see it, the specific question to be decided is whether the interpretation of the statute (§ 214, Subdiv. A, supra), approved in Usher, is of controlling influence in this case.

"It seems to us that Usher is to be distinguished from the instant case. In Usher the claimant had absolutely no affiliation with the striking union, and it was on that basis, and that basis alone, that the statute was interpreted as permitting benefits when the claimant's unemployment is 'because of a "labor dispute" in which he was in no way involved and the causes of which unemployment he, his agents or organization were powerless to avert.' "

\* \* \* \* \* \*

"We think the restrictive provisions of Subdiv. A, § 214, Tit. 26, as amended, supra (for a discussion of this statute see Usher, supra, including the minority opinion), denote a clear legislative purpose and intent; and that such purpose and intent should not be extended beyond the holding in Usher."

The following facts in this case are established by a preponderance of the evidence: (1) the appellee was affiliated with the striking union; (2) the labor strike was called by the appellee's Union in the establishment in which he was employed; (3) the appellee "went out" on strike with the other strikers on the first day of the strike;

(4) the appellee knew at the inception of the strike when he was to report to work during the strike and that he was to be called in to work on the basis of seniority; (5) the appellee saw fit to report to work during the strike only after receiving a pass from his Union; (6) the appellee served on the picket line during the strike; (7) the appellee was not willing to report to work ahead of someone with more seniority without the Union's approval; and (8) the number of employees who worked each day during the strike and the fact that employees were called to work on the basis of seniority was not left to the discretion of the Company but had to be cleared through Union officials.

From these and the other undisputed facts in this case, we conclude that the appellee's partial unemployment followed as a direct result of the strike called by his Union, that appellee was "involved" in that strike or labor dispute, and that his Union was not powerless to avert his unemployment and that, therefore, the appellee cannot invoke the doctrine enunciated in the Usher case, supra. It follows that appellee was disqualified from receiving unemployment compensation benefits under Sec. 214(A), supra.

This cause is due to be and the same is hereby

Reversed and remanded.